# CASE NO. 21-55149

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

### SUSAN PORTER

*Plaintiff-Appellant,*

*v.*

KELLY MARTINEZ, in her official capacity as Sheriff of San Diego
County, and AMANDA RAY, as successor to Warren Stanley, in her
official capacity as Commissioner of California Highway Patrol,

*Defendants-Appellees.*

---

Appeal from United States District Court
Southern District of California, Case No. 3:18-cv-01221-GPC-LL,
Honorable Gonzalo P. Curiel

---

## PETITION FOR REHEARING *EN BANC*

---

David Loy
FIRST AMENDMENT COALITION
534 4th Street, Suite B
San Rafael, CA 94901-3334
Telephone: 415.460.5060

Benjamin J. Morris
Mikle S. Jew
FOLEY & LARDNER LLP
11988 El Camino Real, Suite 400
San Diego, California 92130-2594
Telephone: 858.847.6700

Attorneys for Plaintiff-Appellant SUSAN PORTER

# TABLE OF CONTENTS

Page

RULE 35(b)(1) STATEMENT ..................................................................1

INTRODUCTION ....................................................................................2

BACKGROUND ......................................................................................2

ARGUMENT ...........................................................................................5

I.     THE MAJORITY DECISION CONFUSES FIRST AMENDMENT
LAW AND JEOPARDIZES FREEDOM OF SPEECH. ...............................5

     A.    The Majority Decision Conflicts with Binding Precedent
Rejecting Conjecture as Justification for Banning Speech. ..................5

     B.    The Majority Decision Conflicts with Binding Precedent on
Narrow Tailoring. .............................................................................10

     C.    The Majority Decision also Conflicts with Circuits that
Invalidated Speech Restrictions as Unsupported by Fact or not
Narrowly Tailored. ...........................................................................11

     D.    The Majority Decision Undermines Freedom of Speech in the
Public Square. ..................................................................................13

II.    THE MAJORITY DECISION CONFUSES THE LAW ON
EXCLUDING UNRELIABLE OPINIONS. ...............................................15

CONCLUSION ......................................................................................19

Form 11. Certificate of Compliance ......................................................20

CERTIFICATE OF SERVICE ...............................................................21

APPENDIX ............................................................................................22

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Americans for Prosperity Found. v. Bonta*
141 S. Ct. 2373 (2021) ..................................................................... 11

*Antoninetti v. Chipotle Mexican Grill, Inc.*
643 F.3d 1165 (9th Cir. 2010) ........................................................ 15

*Aptive Envtl., LLC v. Town of Castle Rock*
959 F.3d 961 (10th Cir. 2020) .............................................. 9, 12, 13

*Bay Area Peace Navy v. United States*
914 F.2d 1224 (9th Cir. 1990) ..................................................... 1, 8

*Brewer v. City of Albuquerque*
18 F.4th 1205 (10th Cir. 2021) ......................................... 11, 12, 13

*Burson v. Freeman*
504 U.S. 191 (1992) ...................................................................... 9, 10

*Citizens for Clean Gov't v. City of San Diego*
474 F.3d 647 (9th Cir. 2007) ............................................................. 7

*City of Cincinnati v. Discovery Network, Inc.*
507 U.S. 410 (1993) ............................................................................ 9

*City of Los Angeles v. Preferred Commc'ns, Inc.*
476 U.S. 488 (1986) ............................................................................ 6

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*
657 F.3d 936 (9th Cir. 2011) (en banc) ..................................... 1, 10

*Cutting v. City of Portland*
802 F.3d 79 (1st Cir. 2015) .......................................................... 12, 13

*Cuviello v. City of Vallejo*
944 F.3d 816 (9th Cir. 2019) ................................................. 1, 6, 10

*Daubert v. Merrell Dow Pharms., Inc.*
509 U.S. 579 (1993) ............................................................. 15, 17, 18

ii

*Edenfield v. Fane*
    507 U.S. 761 (1993)............................................................1, 6, 7, 10

*Edwards v. City of Coeur d'Alene*
    262 F.3d 856 (9th Cir. 2001) ..........................................................1, 7

*FCC v. Beach Commc'ns, Inc.*
    508 U.S. 307 (1993)............................................................................8

*FEC v. Ted Cruz for Senate*
    142 S. Ct. 1638 (2022)........................................................................6

*Goedert v. City of Ferndale*
    596 F. Supp. 2d 1027 (E.D. Mich. 2008) ..........................................8

*Hathaway v. Bazany*
    507 F.3d 312 (5th Cir. 2007) ...........................................................18

*Holt Civic Club v. Tuscaloosa*
    439 U.S. 60 (1978)...........................................................................15

*Horina v. City of Granite City*
    538 F.3d 624 (7th Cir. 2008) .....................................................12, 13

*Klein v. City of San Clemente*
    584 F.3d 1196 (9th Cir. 2009) ...................................................1, 7, 8

*Kuba v. 1-A Agric. Ass'n*
    387 F.3d 850 (9th Cir. 2004) ..........................................................1, 7

*McCraw v. City of Oklahoma City*
    973 F.3d 1057 (10th Cir. 2020) .......................................................11

*McCullen v. Coakley*
    573 U.S. 464 (2014)..................................................1, 6, 10, 11, 14

*Meyer v. Grant*
    486 U.S. 414 (1988)........................................................................14

*Nixon v. Shrink Missouri Gov't PAC*
    528 U.S. 377 (2000)........................................................................6, 7

*Pagan v. Fruchey*
    492 F.3d 766 (6th Cir. 2007) ........................................................................12, 13

*Perry v. Los Angeles Police Dep't*
    121 F.3d 1365 (9th Cir. 1997) ........................................................................9

*Phillips v. Borough of Keyport*
    107 F.3d 164 (3d Cir. 1997) ........................................................................12

*Price v. Stevedoring Servs. of Am., Inc.*
    697 F.3d 820 (9th Cir. 2012) ........................................................................9

*Retail Digital Network, LLC v. Prieto*
    861 F.3d 839 (9th Cir. 2017) ........................................................................9

*Reynolds v. Middleton*
    779 F.3d 222 (4th Cir. 2015) ........................................................................13

*Rodriguez v. Maricopa County Cmty. College Dist.*
    605 F.3d 703 (9th Cir. 2010) ........................................................................14

*Sable Communications of Cal. v. FCC*
    492 U.S. 115 (1989) ........................................................................7

*Turner Broad. Sys. v. FCC*
    512 U.S. 622 (1994) ........................................................................6

*United States v. Edge Broad. Co.*
    509 U.S. 418 (1993) ........................................................................6

*United States v. Frazier*
    387 F.3d 1244 (11th Cir. 2004) ........................................................................18

*United States v. Hermanek*
    289 F.3d 1076 (9th Cir. 2002) ........................................................1, 15, 16, 17, 18

*United States v. Playboy Entm't Group*
    529 U.S. 803 (2000) ........................................................................5

*United States v. Ruvalcaba-Garcia*
    923 F.3d 1183 (9th Cir. 2019) ........................................................................18

*United States v. Valencia-Lopez*
   971 F.3d 891 (9th Cir. 2020) ......................................................1, 15, 16, 17, 18

*Wash. Post v. McManus*
   944 F.3d 506 (4th Cir. 2019) ...............................................................................11

*West Virginia State Bd. of Ed. v. Barnette*
   319 U.S. 624 (1943)................................................................................................9

*Yim v. City of Seattle*
   No. 21-35567, 2023 U.S. App. LEXIS 6716 (9th Cir. Mar. 21, 2023)..............11

STATUTES

California Penal Code § 409.7(a)............................................................................15

California Vehicle Code § 27001 ....................................................................2, 5, 13

OTHER AUTHORITIES

Fed. R. App. P. 35(b)(1)(A)......................................................................................1

Fed. R. App. P. 35(b)(1)(B) ......................................................................................1

# RULE 35(b)(1) STATEMENT

Susan Porter seeks rehearing en banc because the split panel opinion conflicts with this Court's First Amendment decisions striking down restrictions on speech based on speculation about "safety," *Cuviello v. City of Vallejo*, 944 F.3d 816 (9th Cir. 2019), *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936 (9th Cir. 2011) (en banc), and *Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850 (9th Cir. 2004), as well as decisions excluding unreliable expert opinions based on "experience," *United States v. Valencia-Lopez*, 971 F.3d 891 (9th Cir. 2020) and *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002).[1] Rehearing en banc is "necessary to secure and maintain uniformity of the court's decisions." Fed. R. App. P. 35(b)(1)(A). Rehearing en banc is also warranted because the opinion involves issues of exceptional importance and conflicts with decisions of the First, Fourth, Fifth, Sixth, Seventh, Tenth, and Eleventh Circuits regarding the standards for reviewing speech restrictions or excluding unreliable opinions. Fed. R. App. P. 35(b)(1)(B).

---

[1] On the First Amendment, the decision also conflicts with *McCullen v. Coakley*, 573 U.S. 464 (2014), *Edenfield v. Fane*, 507 U.S. 761 (1993), *Klein v. City of San Clemente*, 584 F.3d 1196 (9th Cir. 2009), *Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 863 (9th Cir. 2001), and *Bay Area Peace Navy v. United States* 914 F.2d 1224 (9th Cir. 1990).

**INTRODUCTION**

As drivers commonly do without incident, Porter beeped her horn to support a protest. After being cited for doing so, she brought this First Amendment action. Over Judge Berzon's dissent, the panel majority upheld a ban on expression in a public forum without a *single* fact showing the expression causes *any* risk of harm. The majority relied on fact-free conjecture by an "expert" and disregarded facts showing political horn use causes *no* hazard.

The First Amendment requires the government to prove hard facts before restricting speech. Rule 702 requires a foundation that expert opinion is reliable. By endorsing censorship based on conjecture and admitting speculative opinions from "experience" with no showing of reliability, the majority decision conflicts with the Supreme Court, this Court, and multiple other circuits. It confuses the law, threatens freedom of speech, and opens the door to unreliable opinions whenever a purported "expert" asserts "experience," from product liability actions to personal injury cases to prosecution for numerous offenses. Rehearing en banc is warranted to harmonize this Court's precedent on these vital issues.

**BACKGROUND**

At a weekly protest, which involved loudspeakers, singing, and chanting, Porter beeped her horn to support the protest. 2-ER-52–60, 110–111. Deputy Sheriff Kyle Klein cited her for violating California Vehicle Code § 27001, which

prohibits horn use except as a theft alarm or warning. 2-ER-53–54, 61–62.

The statute is rarely enforced. 1-SER-175–77, 4-SER-944–51.

Klein was not distracted by Porter's horn use. 5-ER-1079. Defendants'
"expert," Sergeant William Beck, relied on "experience" unsupported by factual
research, testing, or investigation. 4-ER-682–83, 687, 731. He conjectured about
safety effects of horn use, citing no facts from any source. 4-ER-725, 727–78, 740,
744–45, 754–55, 760, 771, 790–91, 794–95. He did not know of a single "accident
or collision that was caused by the use of a vehicle horn" or "any incident where a
pedestrian was injured" due to horn use. 4-ER-743, 797. The panel cited no such
fact from any source. The legislature made no findings to support the statute, 6-
ER-1317–55, and the panel cited none from elsewhere.

Judge Friedland, joined by a visiting district judge, wrote for the majority,
which acknowledged Porter's horn use was "expressive for First Amendment
purposes" and "most non-warning honks do not create distractions resulting in
accidents." Slip op. 16, 30. Yet the majority upheld a ban on expressive horn use in
the name of "traffic safety," without one fact showing horn use had ever caused
any accident "since the dawn of the automobile." *Id.* at 23, 28–29. Instead, it
depended on Beck's conjectures and "common sense," citing a fable. *Id.* at 28–29.

It also held the ban was "narrowly tailored" on the assumption that "any
honking" for expression is hazardous and speculation that a narrower alternative

"might be counterproductive." *Id.* at 29–30 & n.12. The majority upheld admission of Beck's opinions based on "experience." *Id.* at 26.

Judge Berzon dissented because, among other reasons, Beck "utterly failed to explain how his general law enforcement experience supported the specific opinions he enunciated," and he could not "articulate a reasoned explanation for the connection between his experience" and his opinions. *Id.* at 34 (Berzon, J., dissenting). Even in Beck's limited personal experience, which was "no different from anyone else's experience with horn honking," he did not "report any actual danger created by the honk." *Id.* at 35 (Berzon, J., dissenting). Judge Berzon would have excluded Beck's opinions because there is "no evidence as to why [his] experience, by itself, equals reliability for his testimony." *Id.* at 36 (Berzon, J., dissenting) (quoting *Valencia-Lopez*, 971 F.3d at 898).

Assuming Beck's testimony was admissible, Judge Berzon would still have held the statute violates the First Amendment as applied to political expression. Beck merely "hypothesized" that political horn use would jeopardize safety. *Id.* at 44 (Berzon, J., dissenting). In 24 years of experience, he "did not know of a single accident caused by any type of horn honking." *Id.* (Berzon, J., dissenting). Accordingly, the government established no facts showing political horn use "jeopardizes traffic safety." *Id.* at 33 (Berzon, J., dissenting). "Where '[t]here is no record of harm or safety concerns caused by such activity,' this 'void in the record

belies' the significance of the state interest." *Id.* at 44 (Berzon, J., dissenting) (quoting *Kuba*, 387 F.3d at 860).

Judge Berzon would have held a ban on political horn use is not narrowly tailored, because it contains no "limitations that may tailor [the statute] to situations involving the most serious risk to public peace or traffic safety." *Id.* at 48 (Berzon, J., dissenting) (quoting *Cuviello*, 944 F.3d at 830). There are obvious "alternate methods" allowing "Defendants to achieve the asserted governmental interests," such as laws directly addressing disturbance or distraction. *Id.* at 50 (Berzon, J., dissenting). Section 27001 "may be easier and more efficient to enforce," but "'the prime objective of the First Amendment is not efficiency.'" *Id.* at 51 (Berzon, J., dissenting) (quoting *McCullen*, 573 U.S. at 495).

## ARGUMENT

En banc review is warranted because the panel decision conflicts with decisions of the Supreme Court, this Court, and other circuits; confuses the law; undermines freedom of speech; and opens the door to unreliable opinions.

## I. THE MAJORITY DECISION CONFUSES FIRST AMENDMENT LAW AND JEOPARDIZES FREEDOM OF SPEECH.

### A. The Majority Decision Conflicts with Binding Precedent Rejecting Conjecture as Justification for Banning Speech.

The government bears the burden to justify restricting speech. *United States v. Playboy Entm't Group*, 529 U.S. 803, 816 (2000). To meet its burden, the

government must establish hard facts. Courts may not "assume" the justification, *City of Los Angeles v. Preferred Commc'ns, Inc.*, 476 U.S. 488, 496 (1986), accept "mere conjecture," *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 392 (2000), or depend on "conclusory statements." *Edenfield*, 507 U.S. at 771.

The panel agreed protected expression is at issue. Under the intermediate scrutiny cited by the panel, the government must prove restrictions on speech are "narrowly tailored to serve a significant governmental interest." *McCullen*, 573 U.S. at 486. To do so, it must prove alleged harms "are real, not conjectural." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 664 (1994). It cannot "merely hypothesize" that speech causes problems. *FEC v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1653 (2022). It must "demonstrate that it is regulating speech in order to address what is in fact a serious problem" and the restriction "will contribute in a material way to solving that problem."[2] *Edenfield*, 507 U.S. at 776 (striking down restriction unsupported by evidence that speech "creates the dangers" alleged); *see also Cruz*, 142 S. Ct. at 1653 (striking down restriction where government was "unable to identify a single case" of harm).

The necessary facts might derive from "legislative findings," *Cruz*, 142 S. Ct. at 1653; case law, *Cuviello*, 944 F.3d at 828; "newspaper accounts," *Nixon*, 528

---

[2] Commercial speech cases like *Edenfield* effectively apply intermediate scrutiny. *United States v. Edge Broad. Co.*, 509 U.S. 418, 430 (1993).

U.S. at 393; "studies" or "anecdotal evidence," *Edenfield*, 507 U.S. at 771; or "police records" or "reported injuries." *Kuba*, 387 F.3d at 859. While the "quantum of empirical evidence" might vary, *Nixon*, 528 U.S. at 391, it can never be zero.

A speech restriction must be supported by "tangible evidence." *Edwards*, 262 F.3d at 864 (invalidating restriction due to lack of "factual support"). Therefore, "merely invoking interests in regulating traffic" is insufficient to abridge "one of our most cherished rights" when there is no evidence the speech at issue would cause an alleged "danger to safety." *Kuba*, 387 F.3d at 859.

The government may not incant "hypotheticals, accompanied by vague allusions to practical experience." *Citizens for Clean Gov't v. City of San Diego*, 474 F.3d 647, 653–54 (9th Cir. 2007). The "face of the statute," slip op. 24, is insufficient. *Klein*, 584 F.3d at 1203 ("The title of an ordinance is not evidence of an actual problem."). Without legislative findings, the majority speculates what the legislature had "in mind," slip op. 28, and the First Amendment allows no deference to a record containing "no legislative findings." *Sable Communications of Cal. v. FCC*, 492 U.S. 115, 129 (1989).

As "this court and the Supreme Court have repeatedly emphasized," the government must "show the proposed communicative activity endangers" its interests in fact, not theory. *Klein*, 584 F.3d at 1202 (invalidating ban on vehicle leafleting for lack of proof leaflets materially contributed to litter). The state "is not

free to foreclose expressive activity in public areas on mere speculation about danger"; otherwise, restriction of "expression in public areas would become essentially unreviewable." *Bay Area Peace Navy*, 914 F.2d at 1228. Mere "common sense" cannot suffice because it can "mask unsupported conjecture." *Klein*, 584 F.3d at 1204.

The majority opinion conflicts with these decisions by upholding a ban on expression based on fact-free conjecture about "safety" and alleged "common sense."[3] Slip op. 28. It also disregarded facts showing horn use causes no risk. 5-ER-1079 (Deputy Klein was not distracted by horn use); *Goedert v. City of Ferndale*, 596 F. Supp. 2d 1027, 1033 (E.D. Mich. 2008) ("thousands of expressive honks" supporting protest at busy intersection did not cause "single accident" over "nearly five years").

Under the First Amendment, an ounce of experience is worth a pound of hypotheticals. By upholding a restriction on expression based on unsupported conjecture contradicted by undisputed facts, the majority decision effectively downgrades First Amendment scrutiny to rational basis review, which requires only "rational speculation unsupported by evidence or empirical data." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993). It thus conflicts with precedent

---

[3] The panel did not cite materials the district court found inadmissible, 1-ER-24, which in any event were not probative. Appellant's Reply Brief at 31–36.

rejecting rational basis review of speech restrictions. *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993); *Retail Digital Network, LLC v. Prieto*, 861 F.3d 839, 847 (9th Cir. 2017); *Perry v. Los Angeles Police Dep't*, 121 F.3d 1365, 1371 (9th Cir. 1997).

The majority decision also conflicts with precedent by upholding a rarely enforced ban on expression because it is old and resembles other laws. Slip op. 28–29. First Amendment rights "may not be submitted to vote." *West Virginia State Bd. of Ed. v. Barnette*, 319 U.S. 624, 638 (1943). The existence of similar laws is insufficient to justify enforcing a ban on expression. *Aptive Envtl., LLC v. Town of Castle Rock*, 959 F.3d 961, 995 (10th Cir. 2020). The mere "longstanding" nature of a restriction is not "an adequate reason to sustain" it. *Price v. Stevedoring Servs. of Am., Inc.*, 697 F.3d 820, 842 (9th Cir. 2012). The majority decision offers no principled standard for how many similar laws must exist or for how long to justify a restriction on speech. It thus confuses the law and undermines freedom of speech.

By relying on the mere existence of similar laws and *ipse dixit* about "common sense," slip op. 28, the majority's ruling conflicts with *Burson v. Freeman*, 504 U.S. 191 (1992), which upheld a speech restriction near polling places based on a deep historical record of actual "voter intimidation and election fraud," not just similar laws or alleged common sense. *Id.* at 202. Moreover,

*Burson* excused a lack of current empirical evidence only to protect "the act of voting." *Id.* at 209 n.11. En banc review is necessary to resolve the above conflicts.

**B.  The Majority Decision Conflicts with Binding Precedent on Narrow Tailoring.**

The majority decision also contradicts binding precedent on narrow tailoring. "Precision of regulation must be the touchstone" for restricting speech. *Edenfield*, 507 U.S. at 777. By "demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily sacrificing speech for efficiency." *McCullen*, 573 U.S. at 486.

Assuming there was some "evidence of traffic problems" caused by expressive horn use in some circumstances, the majority decision conflicts with this Court's precedent by upholding a total ban, because courts "cannot simply assume" that expression causes problems in all circumstances. *Comite de Jornaleros*, 657 F.3d at 949 (holding ordinance banning curbside speech was not narrowly tailored to locations where hazards actually existed).

The decision thus conflicts with circuit precedent because a ban on expressive horn use is not tailored to "circumstances where public peace and traffic safety are actually at risk." *Cuviello*, 944 F.3d at 830 (striking down blanket restriction on "*any* use of a sound-amplifying device at *any* volume by *any* person at *any* location"). The decision ignores "readily available alternatives" to address the alleged interest in safety, *Comite de Jornaleros*, 657 F.3d at 950, and a court

10

cannot simply "say that other approaches have not worked." *McCullen*, 573 U.S. at

496; *see also Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2386

(2021) (First Amendment does not allow mere assertion that "alternative means"

are "inefficient and ineffective"); *Yim v. City of Seattle*, No. 21-35567, 2023 U.S.

App. LEXIS 6716, *27, *28 n.17 (9th Cir. Mar. 21, 2023) (holding ordinance was

not "narrowly tailored" given "availability of narrower alternatives" and "blanket

ban on speech goes *much further* than is necessary to serve the interest asserted").

> ### C. The Majority Decision also Conflicts with Circuits that Invalidated Speech Restrictions as Unsupported by Fact or not Narrowly Tailored.

The majority opinion also conflicts with decisions in other circuits that

invalidated speech restrictions unsupported by facts showing any risk to safety.

*Brewer v. City of Albuquerque*, 18 F.4th 1205, 1229, 1244 (10th Cir. 2021)

(invalidating restriction where city offered "theoretical" opinions "unmoored from

any on-the-ground data" about "traffic safety problems" and its case was not

"grounded in anything more than speculation"); *McCraw v. City of Oklahoma City*,

973 F.3d 1057, 1064, 1072 (10th Cir. 2020) (invalidating ban on speech in medians

where city's expert had no "research or data" showing risk to safety and "record is

devoid of evidence that accidents involving vehicles and pedestrians on medians

… is an actual issue, as opposed to a hypothetical concern"); *cf. Wash. Post v.*

*McManus*, 944 F.3d 506, 522 (4th Cir. 2019) ("The First Amendment does not

permit states to broadly conjure hypotheticals in support of expressive burdens."). The First Amendment requires more than "unsubstantiated opinions and allegations." *Aptive Envtl.*, 959 F.3d at 992. "To insist on less is to reduce the First Amendment to a charade." *Phillips v. Borough of Keyport*, 107 F.3d 164, 175 (3d Cir. 1997).

The decision also conflicts with other circuits' holdings by invoking mere "common sense" to uphold a restriction on expression. *Brewer*, 18 F.4th at 1244 (rejecting "generic invocation of 'common sense'"); *Aptive Envtl.*, 959 F.3d at 991, 993 ("common-sense and anecdotal evidence" was "woefully insufficient" because it did not prove speakers are "the source of any public-safety problems" and town could not "point to a specific instance" of harm); *Cutting v. City of Portland*, 802 F.3d 79, 90 (1st Cir. 2015) (rejecting "common sense" about traffic safety unsupported by evidence); *Horina v. City of Granite City*, 538 F.3d 624, 633 (7th Cir. 2008) (government may not "rely on mere common sense" to ban speech because "common sense" can "mask unsupported conjecture"); *Pagan v. Fruchey*, 492 F.3d 766, 773–74, 778 (6th Cir. 2007) (rejecting "conjecture by the police chief" and alleged "common sense" about "harm to traffic" because mere "pronouncement" that restriction "is consistent with common sense hardly establishes that it is so"). If the government need not offer a "panoply" of studies,

it must "proffer *something* showing the restriction actually serves a government interest." *Horina*, 538 F.3d at 633–34. Here, it offered nothing.[4]

Finally, the majority opinion conflicts with decisions holding speech restrictions were not narrowly tailored because the government ignored obvious alternatives to address alleged safety concerns. *Brewer*, 18 F.4th at 1254–56; *Cutting*, 802 F.3d at 91–92; *Reynolds v. Middleton*, 779 F.3d 222, 230–32 (4th Cir. 2015). The "bald assertion" that section 27001 "is not substantially broader than necessary" is not "sufficient to satisfy the narrow-tailoring inquiry" or justify ignoring obvious alternatives, nor can the First Amendment be satisfied by "simply declaring them to be ineffectual." *Brewer*, 18 F.4th at 1255–56. The majority decision thus sows confusion in First Amendment law.

### D. The Majority Decision Undermines Freedom of Speech in the Public Square.

The decision empowers officials to curtail political speech. By stating no principled standard for when the alleged justification is so "logical" that the government need not produce "empirical evidence," slip op. 29, it confuses the law and empowers government to regulate protests into insignificance by asserting that other laws cannot prevent conjectured "safety" concerns. For example, it would

---

[4] It confuses the law to contend "the relevant studies would be prohibitively difficult and expensive." Slip. op. at 29. Expensive studies are unnecessary if sufficient facts are otherwise shown. *Aptive Envtl.*, 959 F.3d at 993; *Pagan*, 492 F.3d at 773 & n.5.

allow a ban on sidewalk protests merely because an "expert" says drivers would jump the curb or pedestrians would fall into the street.

By doing so, it makes First Amendment review an empty formality and threatens to reduce the public square to a "boutique of the banal," *Rodriguez v. Maricopa County Cmty. College Dist.*, 605 F.3d 703, 708 (9th Cir. 2010), not a robust forum to engage in "unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Meyer v. Grant*, 486 U.S. 414, 421 (1988).

Threats to speech do not require "desire to censor. The government may attempt to suppress speech not only because it disagrees with the message being expressed, but also for mere convenience." *McCullen*, 573 U.S. at 486. The majority decision licenses officials to curtail inconvenient protests.

Without en banc review, courts would be left rudderless in reviewing such restrictions. They would not know whether to apply the stringent standard of previous cases or the majority decision's deference to fact-free conjecture. Inconsistent decisions would result, confusing courts and officials.

The decision cannot be limited because Porter sought a potential remedy beyond political expression. First, she never "disavowed" a remedy tailored to protests, slip op. 18 n.6, and she argued it would be appropriate "if the district

court limited the injunction to support of protests."[5] Appellant's Reply Brief at 11. Second, courts may not deny "a meritorious constitutional claim" because a party "seeks one remedy rather than another." *Holt Civic Club v. Tuscaloosa*, 439 U.S. 60, 65-66 (1978) (citing Fed. R. Civ. P. 54(c)).

Regardless of the precise remedy, which is for the district court to decide in the first instance, *Antoninetti v. Chipotle Mexican Grill, Inc.*, 643 F.3d 1165, 1175 (9th Cir. 2010), the record remains barren of facts sufficient to justify a restriction on expression, political or otherwise. The decision's stated rationale cannot be confined to this case and thus undermines First Amendment law.

## II.    THE MAJORITY DECISION CONFUSES THE LAW ON EXCLUDING UNRELIABLE OPINIONS.

Reliability is the touchstone of the court's "gatekeeping role" to exclude unfounded opinions, which can be "powerful and quite misleading." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595, 597 (1993). The majority decision conflicts with this Court's decisions holding mere "experience" cannot make opinions reliable. *Valencia-Lopez*, 971 F.3d at 898; *Hermanek*, 289 F.3d at 1093.

---

[5] At argument, counsel endorsed a remedy tailored to supporting protests. Oral Argument Video at 5:55–6:11, 7:05–7:30, 35:50–38:25, 1:13:25–1:14:00 (https://www.ca9.uscourts.gov/media/video/?20220307/21-55149/). In also proposing a broader remedy, counsel was not "waiving any other argument for appropriate relief." Appellant's Supplemental Brief at 4. A remedy tailored to protests would not confuse officers. *Cf.* Cal. Penal Code § 409.7(a) (imposing certain obligations at "demonstration, march, protest, or rally").

Experience goes to qualifications, but "bare qualifications alone cannot establish the admissibility" of expert opinion. *Hermanek*, 289 F.3d at 1093. By conflating qualifications with reliability, the decision confuses the law, abdicates meaningful gatekeeping, and opens the door to unreliable opinions.

Beck's "experience" was "not subject to routine testing, error rate, or peer review type analysis." *Valencia-Lopez*, 971 F.3d at 898. In such circumstances, the obligation to ensure "reliability becomes more, not less, important." *Id.* Even if a witness has "sufficient experience and knowledge to qualify as an expert" in general, the court retains "an unwavering gatekeeping obligation to determine the reliability" of the specific testimony. *Id.* at 899.

A witness's "qualifications and experience are relevant," but "they cannot establish the reliability and thus the admissibility of the expert testimony at issue." *Id.* at 900. The proponent must "establish the reliability of the principles and methods employed 'to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant*.'" *Hermanek*, 289 F.3d at 1094 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 154 (1999)). The court must ensure that an expert asserting "personal experience" demonstrates "the same level of intellectual rigor" as any expert. *Valencia-Lopez*, 971 F.3d at 898 (quoting *Kumho Tire*, 526 U.S. at 152).

This Court therefore excludes speculative opinions based on "experience" alone. *Valencia-Lopez*, 971 F.3d at 900–01 (holding that although agent had "knowledge and experience sufficient to allow him to testify as an expert on the modus operandi of drug cartels" in general, he never explained "*how* his expertise lent itself" to specific conclusion that cartel would not entrust drugs to coerced driver, and thus he provided no "reliable basis" for opinion); *Hermanek*, 289 F.3d at 1094 (holding agent's opinion was inadmissible where he relied only on "his knowledge and prior investigation of defendants and the 'evidence seized' in the case," because mere "qualifications … conclusions and … assurances of reliability" are "not enough").

The majority decision upheld admission of Beck's opinions based on his "knowledge and experience," with no foundation showing why general experience "working for the CHP, responding to car accidents, and training CHP cadets" made his specific opinions reliable. Slip op. 26. Beck did not opine on a specific accident, and he disavowed knowledge of any accident caused by horn use. He did not explain how or why his "experience" justified his opinions. Instead, he merely offered intuition about what might happen if drivers engaged in expressive horn use, which any layperson might do. The "knowledge" required by Rule 702 "connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 599.

By asserting Beck's testimony was "reliably grounded in his training and experience," slip op. 26, the decision collapsed qualifications into reliability, in conflict with *Valencia-Lopez*, *Hermanek*, and decisions elsewhere. *See, e.g., Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) (noting that "[w]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible" and excluding expert's "personal assurances based on his police experience that his conclusions are so," due to "insufficient factual support and lack of reliable methodology"); *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (qualifications and experience "are by no means a guarantor of reliability" and "under Rule 702, the reliability criterion remains a discrete, independent, and important requirement").

The Rule 702 inquiry may be "flexible," *Daubert*, 509 U.S. at 594, but a court's "latitude to make the reliability determination does *not* include the discretion to abdicate completely its responsibility to do so." *Valencia-Lopez*, 971 F.3d at 898. By conflating experience with reliability, the majority decision effectively authorizes courts "to abandon the gatekeeping function altogether." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1189 (9th Cir. 2019) (cleaned up). Moreover, the decision offers no principled standard for how much or what kind of "experience" can bypass reliability. It confuses courts and opens the door to unreliable opinions whenever a purported "expert" claims some "experience."

**CONCLUSION**

To harmonize circuit law, avoid inter-circuit conflict, protect freedom of

speech, and preclude unreliable opinions, the Court should grant rehearing en banc.

Dated:  April 21, 2023

FIRST AMENDMENT COALITION

By _____
              */s/ David Loy*
              DAVID LOY
              Attorneys for Plaintiff-Appellant
              SUSAN PORTER

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form11instructions.pdf

**9th Cir. Case Number(s)** _21-55149_____

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for

panel rehearing/petition for rehearing en banc/response to petition is *(select one)*:

[X] Prepared in a format, typeface, and type style that complies with Fed. R. App.

P. 32(a)(4)-(6) and **contains the following number of words:** __4,198___.

*(Petitions and responses must not exceed 4,200 words)*

**OR**

[ ] In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** _/s/ David Loy_____ **Date** April 21, 2023____
*(use "s/[typed name]" to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2023, I electronically filed the foregoing

with the Clerk of the Court for the United States Court of Appeals for the Ninth

Circuit by using the CM/ECF system. I certify that all participants in the case are

registered CM/ECF users and that service will be accomplished by the CM/ECF

system.

Respectfully submitted,

Dated:  April 21, 2023

FIRST AMENDMENT COALITION

By _____ */s/ David Loy*
                          DAVID LOY
                    Attorneys for Plaintiff-Appellant
                          SUSAN PORTER

# APPENDIX

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| SUSAN PORTER, | No. 21-55149 |
| *Plaintiff-Appellant,* | D.C. No. 3:18-cv-01221-GPC-LL |
| v. | |
| KELLY MARTINEZ, in her official capacity as Sheriff of San Diego County; AMANDA RAY, as successor to Warren Stanley, in her official capacity as Commissioner of California Highway Patrol, | OPINION |
| *Defendants-Appellees,* | |
| and | |
| WARREN STANLEY, | |
| *Defendant.* | |

Appeal from the United States District Court
for the Southern District of California
Gonzalo P. Curiel, District Judge, Presiding

Argued and Submitted March 7, 2022
Submission Vacated March 17, 2022
Resubmitted March 31, 2023
Pasadena, California

Filed April 7, 2023

Before: Marsha S. Berzon and Michelle T. Friedland,
Circuit Judges, and Edward R. Korman,[*] District Judge.

Opinion by Judge Friedland;
Dissent by Judge Berzon

---

## SUMMARY[**]

---

### Civil Rights

The panel affirmed the district court's summary judgment in favor of the State of California in an action challenging a California law that prohibits honking a vehicle's horn except when reasonably necessary to warn of a safety hazard. Cal. Veh. Code § 27001.

Plaintiff was cited for misuse of a vehicle horn under Section 27001 after she honked in support of protestors gathered outside a government official's office. Although the citation was dismissed, Porter filed suit to block future

---

[*] The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

enforcement of 27001 against any expressive horn use—including honks not only to "support candidates or causes" but also to "greet friends or neighbors, summon children or co-workers, or celebrate weddings or victories." She asserted that Section 27001 violates the First and Fourteenth Amendments as a content-based regulation that is not narrowly tailored to further a compelling government interest. Alternatively, she argued that even if the law is not content based, it burdens substantially more speech than necessary to protect legitimate government interests.

The panel first held that plaintiff had standing to challenge the law because, ever since she received a citation for impermissible horn use, she has refrained from honking in support of political protests to avoid being cited again.

Addressing the merits, the panel determined that at least in some circumstances, a honk can carry a message that is intended to be communicative and that, in context, would reasonably be understood by the listener to be communicative. The panel next held that because section 27001 applies evenhandedly to all who wish to use a horn when a safety hazard is not present, it draws a line based on the surrounding factual situation, not based on the content of expression. The panel therefore evaluated Section 27001 as a content-neutral law and applied intermediate scrutiny. The panel concluded that Section 27001 was narrowly tailored to further California's substantial interest in traffic safety, and therefore that it passed intermediate scrutiny. The panel noted that plaintiff had not alleged that the State has a policy or practice of improper selective enforcement of Section 27001, so the panel had no occasion to address that possibility here.

Dissenting, Judge Berzon would hold that Section 27001 does not withstand intermediate scrutiny insofar as it prohibits core expressive conduct, and is therefore unconstitutional in that respect. The majority's fundamental error was that it failed to sufficiently focus on the specific type of enforcement at the core of this case—enforcement against honking in response to a political protest. Honking at a political protest is a core form of expressive conduct that merits the most stringent constitutional protection, and is, in that respect, qualitatively different from warning honks and other forms of vehicle horn use. Section 27001 violates the First Amendment because defendants have not shown that the statute furthers a significant government interest as applied to political protest honking, and because the statute is not narrowly tailored to exclude such honking. Judge Berzon would grant an injunction prohibiting the enforcement of Section 27001 against political protest honking.

## COUNSEL

John David Loy (argued), First Amendment Coalition, San Rafael, California; J. Mark Waxman, Mikle S. Jew, Lindsey L. Pierce, and Benjamin J. Morris, Foley & Lardner LLP, San Diego, California; for Plaintiff-Appellant.

Jeffrey P. Michalowski (argued), Paul Plevin Sullivan & Connaughton LLP, San Diego, California; Timothy M. White, Senior Deputy, Office of County Counsel, County of San Diego, San Diego, California; for Defendant-Appellee Kelly Martinez, Sheriff of San Diego County.

Sharon L. O'Grady (argued), Deputy Attorney General; Paul E. Stein, Supervising Deputy Attorney General; Thomas S. Patterson, Senior Assistant Attorney General; Rob Bonta, Attorney General of California; Office of the California Attorney General; San Francisco, California; for Defendant-Appellee Amanda Ray, commissioner of California Highway Patrol.

David Snyder, First Amendment Coalition, San Rafael, California; G.S. Hans, Cornell Law School, Ithaca, New York; for Amicus Curiae First Amendment Coalition.

## OPINION

FRIEDLAND, Circuit Judge:

Appellant Susan Porter brings a First Amendment challenge to a California law that prohibits honking a vehicle's horn except when reasonably necessary to warn of a safety hazard. We hold that Porter has standing to challenge that law because, ever since she received a citation for impermissible horn use, she has refrained from honking in support of political protests to avoid being cited again. Applying intermediate scrutiny, we affirm the district court's rejection of Porter's constitutional challenge.

### I.

### A.

California has regulated the use of automobile warning devices such as horns since the dawn of the automobile. In 1913, five years after the introduction of the Model T Ford, California adopted the first version of the law challenged here:

> Every motor vehicle shall be equipped with a bell, gong, horn, whistle or other device in good working order, capable of emitting an abrupt sound adequate in quality and volume to give warning of the approach of such vehicle to pedestrians and to the riders or drivers of animals or of other vehicles and to persons entering or leaving street, interurban and railroad cars. No person shall sound such bell, gong, horn, whistle or other device for any purpose except as a warning of danger.

Act of May 31, 1913, ch. 326, § 12, 1913 Cal. Stat. 639, 645;
*see* Robert Casey, *The Model T: A Centennial History* 1
(2008). Today, the relevant provision of the California
Vehicle Code provides:

> (a) The driver of a motor vehicle when
>     reasonably necessary to insure safe
>     operation shall give audible warning with
>     his horn.

> (b) The horn shall not otherwise be used,
>     except as a theft alarm system.

Cal. Veh. Code § 27001 ("Section 27001"). Section 27001
"applies to all vehicles whether publicly or privately owned
when upon the highways." *Id.* § 24001. "Highway" is
defined as "a way or place of whatever nature, publicly
maintained and open to the use of the public for purposes of
vehicular travel"—in other words, "[h]ighway includes
street." *Id.* § 360. Forty other states and the Uniform
Vehicle Code provide similar limitations on the use of
vehicle horns. *See* Appendix.

Section 27001 is in a division of the California Vehicle
Code regulating the required equipment for vehicles in
California. *See id.* div. 12 ("Equipment of Vehicles"). That
division of the Code contains various other limitations on the
use of equipment for safety purposes. *See, e.g.*, *id.* § 25268
("No person shall display a flashing amber warning light on
a vehicle as permitted by this code except when an unusual
traffic hazard exists."); *id.* § 25269 ("No person shall display
a flashing or steady burning red warning light on a vehicle
except as permitted by Section 21055 or when an extreme
hazard exists."). The Vehicle Code is enforced by the

California Highway Patrol and by local law enforcement agencies.

**B.**

In 2017, Susan Porter drove her car past a group of protesters gathered outside a government official's office— a protest that, minutes earlier, she herself had been attending. As she drove down the street, which was located between a residential area and a six-lane freeway, Porter honked in support of the protesters. A sheriff's deputy pulled her over and gave her a citation for misuse of a vehicle horn under Section 27001. Porter's citation was later dismissed when the sheriff's deputy failed to attend Porter's traffic court hearing. Porter subsequently brought this action challenging the constitutionality of Section 27001.

Porter's Complaint seeks declaratory and injunctive relief against the Sheriff of San Diego County ("the Sheriff") and the Commissioner of the California Highway Patrol ("CHP") in their official capacities (collectively, "the State"[1]). She contends that Section 27001 violates the First and Fourteenth Amendments as a content-based regulation that is not narrowly tailored to a compelling government interest. Alternatively, she argues that even if the law is not content based, it is a content-neutral regulation that burdens substantially more speech than necessary to protect legitimate government interests. Porter alleges that she drives by rallies, protests, and demonstrations in San Diego

---

[1] The Sheriff joins all of CHP's arguments about the constitutionality of Section 27001. Those arguments address all the issues we need to reach to affirm, so we do not consider any arguments that are specific to the Sheriff, including her argument that she is not liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

County and elsewhere in California and would like to express her support for these events by honking. She alleges that she now refrains from using her horn for such purposes because she fears enforcement of Section 27001. Porter seeks to block enforcement of Section 27001 against what she calls "expressive" honking. In Porter's view, expressive horn use includes honks not only to "support candidates or causes" but also to "greet friends or neighbors, summon children or co-workers, or celebrate weddings or victories."

The State moved to dismiss Porter's First Amendment claim. The State argued that even if Section 27001 governs expressive activity, the law is content neutral and reasonably furthers California's interests in promoting traffic safety and reducing noise pollution. Applying intermediate scrutiny, the district court concluded that, on the pleadings at least, the State had "defaulted on [its] burden of showing that honks such as Plaintiff's undermine the government's interest in traffic safety and noise control." Accordingly, the district court refused to dismiss the First Amendment claim.

The parties proceeded to discovery and eventually filed cross-motions for summary judgment. In support of the noise-control rationale for Section 27001, the State submitted numerous government reports and scientific articles discussing the contributions honking and other traffic sounds can make to noise pollution, and the dangers noise pollution poses to human health.

In support of the traffic-safety rationale, the State relied heavily on the expert testimony of Sergeant William Beck, a twenty-four-year veteran of CHP. Sergeant Beck opined that "when a vehicle horn is used improperly, it can create a dangerous situation by startling or distracting drivers and others," and that "the vehicle horn's usefulness as a warning

device would be diminished if law enforcement officers were unable to enforce Vehicle Code section 27001." He explained:

> Absent Vehicle Code section 27001, people would be free to, and could be expected to, use the horn for purposes unrelated to traffic safety. That would, in turn, diminish the usefulness of the vehicle horn for its intended purpose, which is to be used as a warning or for other purposes related to the safe operation of a vehicle.

When asked in a deposition, Sergeant Beck admitted that he was unaware of any "specific accident or collision that was caused by the use of a vehicle horn." Porter's rebuttal expert, Dr. Peter Hancock, criticized Sergeant Beck's opinions about the link between Section 27001 and traffic safety as unsupported by scientific studies; relying in part on these criticisms, Porter moved unsuccessfully to exclude Sergeant Beck's expert testimony under Federal Rule of Evidence 702.

The district court entered summary judgment in favor of the State. After holding that Porter had standing to bring a pre-enforcement challenge based on self-censorship, the district court repeated its earlier conclusion that Section 27001 is content neutral and subject to intermediate scrutiny. The court excluded the State's government and scientific reports as hearsay but held that, although the State "ha[d] offered little in the way of scientific studies that [wa]s not hearsay, . . . history, consensus, common sense, and the declaration of Sergeant Beck support[] the [State's] proffered justification[s]." The court concluded that

California's interests in maintaining traffic safety and reducing noise pollution are significant, and that Section 27001 is narrowly tailored to serve those interests.

Porter timely appealed.

## II.

We evaluate standing de novo. *California v. Azar*, 911 F.3d 558, 568 (9th Cir. 2018). We also review de novo an order granting summary judgment. *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1171 (9th Cir. 2018).

## III.

To establish Article III standing, a plaintiff must show that she suffered an injury in fact, the injury is fairly traceable to the challenged conduct of the defendant, and it is likely that her injury will be redressed by a favorable judicial decision. *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1171 (9th Cir. 2018). "First Amendment challenges 'present unique standing considerations' because of the 'chilling effect of sweeping restrictions' on speech." *Id.* at 1171 (quoting *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003)). "[W]here a plaintiff has refrained from engaging in expressive activity for fear of prosecution under the challenged statute, such self-censorship is a constitutionally sufficient injury as long as it is based on an actual and well-founded fear that the challenged statute will be enforced." *Libertarian Party of L.A. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013) (alteration in original) (quoting *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1001 (9th Cir. 2010)). To assess the credibility of a claimed threat of enforcement, we have looked to factors such as "(1) whether the plaintiffs have articulated a 'concrete plan' to violate the law in question,

(2) whether the prosecuting authorities have communicated a specific warning or threat to initiate [enforcement] proceedings, and (3) the history of past prosecution or enforcement under the challenged statute."**²** *Id.* (quoting *McCormack v. Hiedeman*, 694 F.3d 1004, 1021 (9th Cir. 2012)).

The State argues that Porter has not established a well-founded fear because she has not shown a concrete plan for expressive honking and she previously "honked only at the single protest at which she was cited." The State's argument is unpersuasive. Porter testified: "[I]f I was driving down the freeway and there was a banner that said 'Support Our Veterans,' I now would not honk my horn because the CHP could pull me over." She also described driving by specific political protests where she had wished to honk to show her support but refrained from doing so to avoid receiving another citation. Porter's testimony is specific enough to show that her expressive activity is being chilled.

The State next argues that the odds of anyone being cited for honking are "vanishingly small." For example, CHP points out that it issues an average of eighty citations per year for Section 27001 violations. Similarly, evidence in the record shows that in recent years the Sheriff's Department has issued approximately eight citations per year under Section 27001. But both CHP and the Sheriff nevertheless do enforce Section 27001, and they do not disclaim their ability to do so in cases of expressive honking. That Porter was cited the one time she honked in support of a protest is "good evidence that the threat of enforcement is not

---

² As discussed below, we conclude that honking can constitute expressive activity.

'chimerical.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). Whatever the statistical likelihood of any driver's receiving a Section 27001 citation, Porter's own experience supports "an actual and well-founded fear that the challenged statute will be enforced" against her. *Bowen*, 709 F.3d at 870 (quoting *Human Life*, 624 F.3d at 1001). Porter has thus shown a concrete injury in the form of self-censorship caused by Section 27001.

The State further argues that Porter's alleged injury is not redressable, contending that a statewide injunction to protect expressive honking would be unconstitutionally vague and would raise concerns about federalism. But those concerns go to the proper scope of any remedy, not the "constitutional minimum" of redressability, which "depend[s] on the relief that federal courts are *capable* of granting." *Kirola v. City & County of San Francisco*, 860 F.3d 1164, 1176 (9th Cir. 2017). Because the district court *could* declare Section 27001 unconstitutional and unenforceable in its entirety, thereby redressing Porter's alleged injury, we conclude that the redressability requirement is satisfied. We therefore proceed to the merits of Porter's First Amendment challenge.

## IV.

The First Amendment "literally forbids the abridgment only of 'speech,'" but its protections "do[] not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Conduct—such as burning a flag, wearing a black armband, or staging a sit-in—"may be 'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.'" *Id.* (quoting *Spence v. Washington*, 418 U.S. 405, 409 (1974)

(per curiam)); *see also id.* at 406 (holding that burning an American flag at a political protest was protected expression); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505-06 (1969) (holding that wearing black armbands to protest the war in Vietnam was protected expression); *Brown v. Louisiana*, 383 U.S. 131, 141-42 (1966) (holding that a silent sit-in to protest racial segregation in a public library was protected expression). "Non-verbal conduct implicates the First Amendment when it is intended to convey a 'particularized message' and the likelihood is great that the message would be so understood." *Nunez v. Davis*, 169 F.3d 1222, 1226 (9th Cir. 1999) (quoting *Johnson*, 491 U.S. at 404)). That said, "a narrow, succinctly articulable message is not a condition of constitutional protection" for expressive conduct. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995).

In "quintessential public forums" such as streets, parks, and other "places which by long tradition . . . have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). "The government bears the burden of justifying the regulation of expressive activity in a public forum." *Berger v. City of Seattle*, 569 F.3d 1029, 1035 (9th Cir. 2009) (en banc).

When considering a First Amendment challenge to a law regulating expression in a public forum, we ask first whether the law is content based or content neutral. *United States v. Swisher*, 811 F.3d 299, 311 (9th Cir. 2016) (en banc). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*,

576 U.S. 155, 163 (2015). The "crucial first step in the content-neutrality analysis," the Supreme Court has instructed, is "determining whether the law is content neutral on its face"—that is, whether it "draws distinctions based on the message a speaker conveys." *Id.* at 163, 165. "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 165 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)). The second step in the content-neutrality analysis is to ask whether the law is content based in its justification. Even "facially content neutral" regulations will be considered content based if they "cannot be 'justified without reference to the content of the regulated speech'" or "were adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Id.* at 164 (alteration in original) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

The threshold content-neutrality question is often critical. "It is rare that a regulation restricting speech because of its content will ever be permissible," *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 818 (2000), because such a regulation must satisfy strict scrutiny—that is, "the regulation is valid only if it is the least restrictive means available to further a compelling government interest," *Berger*, 569 F.3d at 1050. By contrast, a content-neutral regulation of expression must meet the less exacting standard of intermediate scrutiny. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994). For content-neutral rules governing expressive conduct, then, a regulation is constitutional "if it furthers an important or substantial governmental interest; if the governmental interest is

unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968); *see Swisher*, 811 F.3d at 312.**3**

## A.

The parties do not dispute that Section 27001 effectively forbids drivers from honking in public forums unless there is a traffic-safety reason to do so. That makes sense, because Section 27001 applies on public streets, which are "the archetype of a traditional public forum." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 945 (9th Cir. 2011) (en banc) (quoting *Snyder v. Phelps*, 562 U.S. 443, 456 (2011)).**4**

The parties also do not dispute that at least some of the honking prohibited by Section 27001 is expressive for First Amendment purposes. We agree. Whether conduct such as honking is "sufficiently imbued with elements of communication" to be protected expression depends on "the

---

[3] The *O'Brien* test is substantively equivalent to the requirement that a content-neutral time, place, or manner restriction on speech be "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293, 298 & n.8 (1984); *see Swisher*, 811 F.3d at 312 & n.7 (explaining that the two tests are equivalent). In the analysis that follows, we therefore rely on cases applying either test.

[4] Presumably because Section 27001 applies in some public forums, the State concedes that intermediate scrutiny applies to our evaluation of the statute's constitutionality. Given that concession, and because we conclude that the law survives intermediate scrutiny, we need not decide whether all the places in which Section 27001 applies are public forums.

nature of [the] activity, combined with the factual context and environment in which it was undertaken." *Spence*, 418 U.S. at 409-10. The protest at which Porter received a Section 27001 citation provides an example. Porter attended the protest and, while departing in her car, honked her horn in three clusters of short beeps, for a total of fourteen beeps. She later testified that her intent was to show support for the protest. The crowd cheered, suggesting that the group with which she had just been protesting understood her intended message. Porter's experience shows that, at least in some circumstances, a honk can carry a message that "is intended to be communicative and that, in context, would reasonably be understood by the [listener] to be communicative." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984). Of course, a honk is just a noise, so it may not always be understood—indeed, it may be particularly susceptible to being *mis*understood given the inflexibility of the medium. A driver honking while passing by a protest might be expressing support, expressing disagreement, or signaling to another driver that continuing to change lanes could cause an accident. But the nature and circumstances of the honk will sometimes provide the necessary context for the message intended by the honk to be understood. Although we do not define today the full scope of expressive honking, we hold that enough honks will be understood in context to treat Section 27001 as prohibiting some expressive conduct.[5]

---

[5] Porter's Complaint purported to challenge Section 27001 both (1) on its face and (2) as applied to expressive horn use, though at times in the litigation she has seemed to use these phrases interchangeably. Those challenges are probably not entirely equivalent, because some horn use

## B.

We next consider whether Section 27001 is a content-based regulation of expressive honking.**[6]**  Again, Section 27001 provides that "[t]he driver of a motor vehicle when

---

seems neither safety-related nor expressive. For example, a driver might honk along to the beat of music, or a child might reach over the driver to honk the horn for fun. Ultimately, however, we need not decide whether Porter's claim is best described as an as-applied or facial challenge (or both). Our constitutional analysis will be the same either way because "the substantive legal tests used in [facial and as-applied] challenges are 'invariant.'" *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011) (quoting *Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010)).

[6] The dissent argues that Section 27001 is unconstitutional as applied to *political* honking—specifically, "honking in response to a political protest." But Porter herself has not advanced that argument, contending instead that the statute is unconstitutional as applied to *all* expressive honking, which under her definition includes honking to communicate greetings and celebratory sentiments, among other things. Indeed, when pressed at oral argument on whether she sought to enjoin the statute as applied only to political honking, she expressly disavowed any such limitation of her argument, firmly replying that she sought to enjoin enforcement against "all expressive conduct through use of a vehicle horn." Taking Porter at her word, we decide only whether the statute is unconstitutional on its face or as applied to all expressive honking. *See Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1071 n.8 (9th Cir. 2021) (declining to consider certain arguments where the defendant failed to make the relevant arguments in its briefing and disclaimed such arguments at oral argument); *cf. Greenlaw v. United States*, 554 U.S. 237, 243 (2008) ("[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present."). We emphasize that although Porter's Article III standing stems from the citation she received after honking at a protest, that citation was dismissed, and no aspect of her current arguments or our analysis of them turns on the particular facts of that incident.

reasonably necessary to [e]nsure safe operation shall give audible warning with his horn," but that "[t]he horn shall not otherwise be used, except as a theft alarm system."**7**  Cal. Veh. Code § 27001.  Porter argues that Section 27001 is content based "on its face" because it "draws distinctions based on the message a speaker conveys."  *Reed*, 576 U.S. at 163.

We disagree.  Even if we were to accept Porter's questionable assertion that honking to give a warning is a form of expression, the relevant distinction Section 27001 makes is not, as Porter suggests, between honks intended to convey warnings and honks intended to convey other messages.  Rather, the law prohibits *all* driver-initiated horn use except when such use is "reasonably necessary to [e]nsure safe operation" of the vehicle.  Thus, while it may be that Section 27001 prohibits some expressive conduct, the primary distinction the statute makes does not depend on the message that might be conveyed.  Section 27001 does not single out for differential treatment, for example, political honking, ideological honking, celebratory honking, or honking to summon a carpool rider.  Instead, the law "applies evenhandedly to all who wish to" use the horn when a safety hazard is not present.  *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981). Section 27001 draws a line based on the surrounding factual situation, not based on the content of expression.**8**

---

[7] Use of a horn as a theft alarm is part of an automatic system, not a honk initiated by the driver.  *See* Cal. Veh. Code. § 28085.  Porter does not argue that the exception for theft alarms is a content-based distinction.

[8] It is true that, in those safety-related situations where honking is permitted, Section 27001 permits the driver to honk only to "give audible

Porter contends that Section 27001 is content based on its face because an officer must "'examine the content of the message that is conveyed to determine whether' a violation has occurred." *McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984)). But to conclude that a honk complies with the statute, an officer need not examine the "content" of the honk the way one might read a sign or evaluate a spoken statement—he need only observe the traffic circumstances and determine if a safety risk is present. For instance, the sheriff's deputy who cited Porter explained that he "was watching the traffic" and "didn't see an emergency" when Porter honked, so he decided to pull her over.

In any event, even if evaluating the traffic-related *context* of a honk involves listening to the sound of the horn—and thus could be seen as analogous to reading a sign to evaluate its content—the Supreme Court recently rejected as "too extreme an interpretation of [its] precedent" a rule "that a [sign] regulation cannot be content neutral if it requires reading the sign at issue." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022). In *City of Austin*, the Court considered a challenge to a city ordinance that distinguished between "off-premises" and

---

warning." But Porter has not argued that it violates the First Amendment to allow only warning, but not other, honks when a warning honk is "reasonably necessary to [e]nsure safe operation" of the vehicle. Moreover, Porter likely would not have standing to challenge an alleged content-based distinction in the context of a scenario where honking is "reasonably necessary to [e]nsure safe operation" of the vehicle. After all, the honk she was cited for did not occur in such a situation, and she never has claimed to want to give non-warning honks when a safety concern is present.

"on-premises" signs—that is, "between signs (such as billboards) that promote ideas, products, or services located elsewhere and those that promote or identify things located onsite." *Id.* at 1469. The Court explained that the most recent case in which it had held a sign ordinance to be content based, *Reed v. Town of Gilbert*, had involved "a comprehensive sign code that 'single[d] out specific subject matter for differential treatment.'" *Id.* at 1471 (alteration in original) (quoting *Reed*, 576 U.S. at 169); *see also Reed*, 576 U.S. at 160-61 (discussing an ordinance with different rules for "ideological" signs, "political" signs, and "temporary directional" signs relating to events "sponsored, arranged, or promoted by a religious, charitable, community service, educational, or other similar non-profit organization"). In *City of Austin*, by contrast, the Court held that the sign ordinance was content neutral because "the City's off-premises distinction require[d] an examination of speech only in service of drawing neutral, location-based lines. It [was] agnostic as to content." 142 S. Ct. at 1471.

Indeed, the Supreme Court has "consistently recognized that restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral." *Id.* at 1473. As the Court emphasized in *City of Austin*, it has treated as content neutral regulations of solicitation—"that is, speech 'requesting or seeking to obtain something' or '[a]n attempt or effort to gain business,'" *Id.* (alteration in original) (quoting *Solicitation*, Black's Law Dictionary (11th ed. 2019))—even though enforcement requires an examination of the speaker's message. The Court explained:

> To identify whether speech entails solicitation, one must read or hear it first. Even so, the Court has reasoned that

> restrictions on solicitation are not content
> based and do not inherently present "the
> potential for becoming a means of
> suppressing a particular point of view," so
> long as they do not discriminate based on
> topic, subject matter, or viewpoint.

*Id.* (quoting *Heffron*, 452 U.S. at 649).

Under these cases, the fact that an officer, after hearing
the sound of a honk, would need to look at the surroundings
for a traffic hazard before deciding if the honk was
"reasonably necessary to [e]nsure safe operation" of the
vehicle, does not render the limitation on honking a content-
based regulation of expression. Such an examination—like
evaluating a message to determine if it is solicitation, or
reading a sign to see if it is on-premises or off-premises
advertising—"do[es] not inherently present 'the potential for
becoming a means of suppressing a particular point of
view.'" *Id.* (quoting *Heffron*, 452 U.S. at 649).

Turning to the final step of the content-neutrality inquiry,
we have no concern that Section 27001 "cannot be 'justified
without reference to the content of the regulated speech'" or
was "adopted by the government 'because of disagreement
with the message [the speech] conveys.'" *Reed*, 576 U.S. at
164 (alteration in original) (quoting *Ward*, 491 U.S. at 791).
Porter does not argue that Section 27001 is justified by
anything other than the safe operation of motor vehicles and
noise reduction, nor does she argue that the California
legislature was motivated by disagreement with any
particular expressive use of the vehicle horn. Aware of no
evidence that would have supported such arguments, we
proceed to evaluate Section 27001 as a content-neutral law,
applying intermediate scrutiny.

## C.

To survive intermediate scrutiny, a content-neutral regulation of expressive conduct must "further[] an important or substantial governmental interest," that interest must be "unrelated to the suppression of free expression," and the "incidental restriction on alleged First Amendment freedoms [must be] no greater than is essential to the furtherance of that interest." *O'Brien*, 391 U.S. at 377. To be no more burdensome "than is essential to the furtherance of" the government's interest, *id.*, a regulation "need not be the least restrictive or least intrusive means" of serving that interest. *Ward*, 491 U.S. at 798. But the "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* at 799. The regulation must also "leave open ample alternative channels for communication of the information." *Clark*, 468 U.S. at 293.

### 1.

We first consider whether Section 27001 furthers a substantial government interest that is unrelated to the suppression of free expression. The State asserts that Section 27001 furthers its interest in traffic safety. There can be no doubt that this interest is substantial. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507-08 (1981) (holding that traffic safety is a "substantial governmental goal[]"). And California's interest in traffic safety is unrelated to the suppression of free expression; Porter does not contend otherwise. But our inquiry does not end there, because when the government seeks to regulate expression, even incidentally, to address anticipated harms, it must "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these

harms in a direct and material way." *Turner*, 512 U.S. at 664. That is, we must be persuaded that the law actually furthers the State's asserted interests.

The asserted interest in traffic safety appears on the face of the statute itself. Section 27001's first subsection provides that the driver of a motor vehicle shall, "when reasonably necessary *to [e]nsure safe operation*," "give audible warning with his horn." Cal. Veh. Code § 27001(a) (emphasis added). The second subsection then dictates that "[t]he horn shall not otherwise be used, except as a theft alarm system." *Id.* § 27001(b). These twin commands make logical sense: For the horn to serve its intended purpose as a warning device, it must not be used indiscriminately.**[9]**

The State's expert testimony supports that logic. Drawing on his decades of experience working for the CHP, Sergeant Beck explained that "the horn itself is a great warning device for traffic safety" because it allows drivers to "communicate if there's a hazardous situation." He went on to opine that indiscriminate horn use could dilute the potency of the horn as a warning device, testifying that if law enforcement officers were unable to enforce Section 27001, "the public in general would . . . [think it was] okay to use your horn whenever you want for whatever purpose." He

---

[9] The dissent contends that this justification for Section 27001 is undercut by the statute's lack of enforcement. There is no evidence in the record, however, indicating that the statute is indeed rampantly underenforced. The State acknowledges that citations for violations of the statute are rare, but this says nothing about how frequently the statute is *violated*—citations could be rare for the simple reason that violations are rare. To the extent that the dissent relies on Lieutenant Munsey's comment to Deputy Klein as evidence of underenforcement, that comment's meaning is too hard to decipher to support the dissent's claim that "Section 27001 is pretty much a dead letter."

said that, as a result, "people would not recognize the horn as something that's used for safety or to warn them of a hazard" and "the effectiveness of the horn would be diminished." In other words, the more drivers honk in protest, or in greeting, or for no reason at all, the less likely people are to be alerted to danger by the sound of a horn.

Sergeant Beck also explained that indiscriminate horn use can distract other drivers and pedestrians. He opined that, "when a vehicle horn is used improperly, it can create a dangerous situation by startling or distracting drivers and others." Sergeant Beck explained that, in his own experience, the sound of a horn "makes me look up, take my eyes off what I'm doing, which could affect my safety." He also explained that honking can startle pedestrians in high-traffic areas, potentially putting them in harm's way.

Porter argues that the State has not met its burden to show that Section 27001 furthers traffic safety because it relied primarily on Sergeant Beck's testimony, which Porter contends was pure speculation and should not have been admitted. We disagree.

As an initial matter, the district court did not abuse its discretion in admitting Sergeant Beck's testimony under Federal Rule of Evidence 702. "The inquiry envisioned by Rule 702 is . . . a flexible one." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 594 (1993). In evaluating expert testimony, the district court need not follow a "definitive checklist or test." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (quoting *Daubert*, 509 U.S. at 593). Where an expert offers non-scientific testimony, "reliability depends heavily on the *knowledge and experience* of the expert, rather than the methodology or theory behind" the testimony. *Hangarter v. Provident Life & Acc. Ins. Co.*, 373

F.3d 998, 1017 (9th Cir. 2004) (quoting *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000)); *see also Kumho Tire*, 526 U.S. at 150 (explaining that the reliability inquiry "may focus upon personal knowledge or experience" of the witness).

The district court carefully considered Sergeant Beck's knowledge and experience before concluding that his opinions were relevant, reliable, and helpful to the court. The court pointed, for example, to Beck's "extensive experience working for the CHP, responding to car accidents, and training CHP cadets." To be sure, "reliability becomes more, not less, important when the 'experience-based' expert opinion is perhaps not subject to routine testing, error rate, or peer review type analysis, like science-based expert testimony." *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020). But "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire*, 526 U.S. at 152. The district court appropriately exercised that discretion here in concluding that Sergeant Beck's opinions were relevant, reliably grounded in his training and experience, and helpful to the court.

Sergeant Beck's decades of experience in highway patrol allowed him to elucidate "the practical realities" of Section 27001's relationship to traffic safety. Given that Sergeant Beck's experience comes from a world in which Section 27001 does exist, he could not reasonably be expected to opine authoritatively—contrary to what the dissent seems to suggest—on what traffic safety would be like in the absence

of that statute.[10]  He could, however, help the court assess the *current* relationship between Section 27001 and traffic safety.

Although Porter's expert criticized Sergeant Beck's opinions about the impact of enjoining Section 27001 enforcement against expressive activity, averring that they were "founded upon insufficiently representative observations" to be "scientifically reliable," he did not contend that Sergeant Beck's explanations were wrong—rather, he merely opined that "we don't have the science to support or deny" those explanations.  In other words, studies on the issue simply do not exist.  And Porter's own expert acknowledged that conducting a study to obtain such evidence would be both "very expensive" and "exceptionally difficult."  Given the infeasibility of scientific studies on the topic, it was not inappropriate to treat Sergeant Beck as having gained expertise from his decades of experience enforcing traffic safety.

Once properly admitted, Sergeant Beck's testimony assisted the State in meeting its burden under intermediate scrutiny.  The Supreme Court has instructed that courts must "never accept[] mere conjecture as adequate to carry a First Amendment burden." *Nixon v. Shrink Mo. Gov't PAC*, 528

---

[10] The dissent seems to assume that Section 27001 is effectively nonexistent. But Section 27001 does exist, and we take judicial notice of the fact that California's driver education materials, provided for anyone taking the test for a state driver's license, instruct that the horn should be used only "to let other drivers know you are there," "warn others of a hazard," "avoid collisions," or "alert oncoming traffic on narrow mountain roads where you cannot see at least 200 feet ahead"―all safety-related functions. *See* State of Cal. Dep't of Motor Vehicles, *California Driver's Handbook* 13 (2023), https://www.dmv.ca.gov/portal/file/california-driver-handbook-pdf.

U.S. 377, 392 (2000).   But "the quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the [law's] justification." *Id.* at 391.   In a case applying strict scrutiny to content-based restrictions around polling places, for instance, the Supreme Court has considered "[a] long history, a substantial consensus, and simple common sense" to be sufficient evidence to support the justification of protecting the fundamental right to vote. *Burson v. Freeman*, 504 U.S. 191, 211 (1992).

There is nothing novel about Section 27001's traffic-safety justification—in fact, it seems the California legislature had traffic safety in mind when it first enacted a version of Section 27001 in 1913.   That early version of the law prohibited honking "for any purpose except as a warning of danger."   Act of May 31, 1913, ch. 326, § 12, 1913 Cal. Stat. 639, 645.   The traffic-safety justification for restricting the use of the horn can also be seen in the vehicle codes of at least forty other states, indicating a near-nationwide consensus on the need for such laws.   *See* Appendix; *see also, e.g.*, Del. Code Ann. tit. 21, § 4306(b) ("The driver of a vehicle shall, when reasonably necessary to insure safe operation, give audible warning with the horn but shall not otherwise use the horn for any other purpose.").   This long history and consensus, coupled with the common-sense inference that the horn's usefulness as a warning tool will decrease the more drivers use it for any other function, support the State's asserted interest in traffic safety.

"Sound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable." *Turner*, 512 U.S. at 665.   Here—where the law has existed since the

dawn of the automobile, forty other states have similar laws, the law's justification is so logical, and conducting the relevant studies would be prohibitively difficult and expensive—California does not need to produce new empirical evidence to justify Section 27001. "There might, of course, be [a] need for a more extensive evidentiary documentation" if Porter "had made any showing of [her] own to cast doubt" on the State's justifications. *Nixon*, 528 U.S. at 394. But Porter has done nothing to cast doubt on Sergeant Beck's testimony that Section 27001 helps guard against distracting honking, or the entirely common-sense inference that, the more drivers honk for non-warning purposes, the less people can rely on the sound of a honk as an alert of imminent danger. *See* Aesop, *The Shepherd Boy and the Wolf*, *in* Aesop's Fables 74, 74 (Boris Artzybasheff ed., Viking Press 1947) (1933) (telling the tale of a boy who cried "Wolf!" to trick local villagers so many times that later, when a wolf actually arrived and the boy "cried out in earnest," the "neighbors, supposing him to be at his old sport, paid no heed to his cries").[11]

Accordingly, we conclude that Section 27001 "furthers an important or substantial governmental interest" that is "unrelated to the suppression of free expression." *O'Brien*, 391 U.S. at 377.

## 2.

We are also persuaded that Section 27001 is narrowly tailored to further California's interest in traffic safety. The

---

[11] Contrary to Porter's suggestion, the exception for theft alarms does not undermine California's anti-dilution justification for Section 27001. Theft alarms sound very different from honking initiated by the driver, so they are unlikely to be mistaken for warning honks.

statute encourages the use of a vehicle's horn "when reasonably necessary to [e]nsure safe operation" and prohibits honking in all other circumstances—because, as explained above, honking when there is no hazard both dilutes the horn's usefulness as a safety device and creates dangers of its own. To be sure, most non-warning honks do not create distractions resulting in accidents, but we discern no plausible means by which California could permit non-distracting honks while prohibiting distracting honks.**12**

---

[12] Porter points to a local ordinance in Rio Rancho, New Mexico, which provides: "No person shall . . . operate a motor vehicle's equipment, including but not limited to the vehicle horn or lights, in such manner as to distract other motorists on the public way or in such a manner as to disturb the peace." Rio Rancho Mun. Code § 12-6-12.18(5). She argues that such a law would be more narrowly tailored to promoting traffic safety. Although "the existence of obvious, less burdensome alternatives is 'a relevant consideration in determining whether the fit between ends and means is reasonable,'" the State need not adopt "'the least restrictive or least intrusive means' available to achieve [its] legitimate interests." *Berger*, 569 F.3d at 1041 (first quoting *Cincinnati*, 507 U.S. at 417 n.13, then quoting *Ward*, 491 U.S. at 798). In any event, we are not persuaded that this sort of alternative law would achieve California's interest in traffic safety. A law against distracting honking might be counterproductive if it discouraged honking to warn others of danger. And, as the State notes, New Mexico has a statewide law similar to California's that instructs drivers to honk only when reasonably necessary to ensure traffic safety, but not otherwise—suggesting that the local ordinance does not need to achieve the same traffic safety goals as Section 27001, because a statewide law already has those goals covered. N.M. Stat. Ann. § 66-3-843(A).

The dissent also contends that local noise ordinances or California Penal Code § 415(2), which prohibits "maliciously and willfully disturb[ing] another person by loud and unreasonable noise," could allow the State more narrowly to achieve its interests in traffic safety and noise control. But Porter has offered no argument that such noise control provisions

And, regardless, *any* honking other than "when reasonably necessary to [e]nsure safe operation" of the vehicle undermines the effectiveness of the horn when used for its intended purpose of alerting others to danger. Thus, by banning horn use in all other circumstances, the State "did no more than eliminate the exact source of the evil it sought to remedy." *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 808 (1984).

Finally, Section 27001 plainly leaves open ample alternative channels for people to communicate their ideas and messages, including from their cars. Porter argues that Section 27001 prevents spontaneous communication by drivers about protests or other events, but common sense and Porter's own testimony indicate otherwise. As Porter herself has done on numerous occasions, drivers can park their cars and attend political demonstrations on foot. They can also express agreement with protestors from their cars by waving, giving a thumbs up, or raising a fist as they drive by.**[13]** They can put bumper stickers on their cars. Although some people may find it more satisfying to honk in certain circumstances, "[w]e will not invalidate a regulation merely because it restricts the speaker's preferred method of communication." *United Bhd. of Carpenters & Joiners v. NLRB*, 540 F.3d 957,

---

would achieve the State's goal of ensuring traffic safety. In any event, our holding rests on the state's interest in traffic safety alone. Because we conclude that Section 27001 is narrowly tailored to advancing California's substantial interest in traffic safety, we do not address the parties' arguments about the State's separate interest in noise control.

[13] The dissent theorizes that these options "would surely pose a greater threat to traffic safety than a honk." But there is no basis for the conclusion that briefly taking a hand off the wheel is more dangerous than startling others by honking.

969 (9th Cir. 2008); *see also Taxpayers for Vincent*, 466 U.S. at 812 ("[T]he First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places.").

We hold that Section 27001 is narrowly tailored to advancing California's substantial interest in traffic safety, and therefore that it passes intermediate scrutiny.

**\* \* \***

We make one final observation: It appears that Section 27001 citations are not common, and officers are taught to use "sound professional judgment" in deciding whether to give a warning or a citation for a violation of Section 27001. As the dissent aptly observes in footnote 6, such broad discretion *could* open the door to selective enforcement. Porter does not allege, however, that the State has a policy or practice of improper selective enforcement of Section 27001, so we have no occasion to address that possibility here.

## V.

For the foregoing reasons, we affirm the district court's summary judgment in favor of the State.

BERZON, Circuit Judge, dissenting:

The majority today upholds a ban on a popular form of political expressive conduct—honking horns to support protests or rallies. Political protest "has always rested on the highest rung of the hierarchy of First Amendment values." *Carey v. Brown*, 447 U.S. 455, 467 (1980). Defendants' enforcement of California Vehicle Code Section 27001 prohibited Susan Porter from exercising her right to participate in political protest by honking in support of a demonstration against an elected official.[1] Yet, there is no evidence in the record (or elsewhere, as far as I can determine) that such political expressive horn use jeopardizes traffic safety or frustrates noise control.

I therefore respectfully dissent. I would hold that Section 27001 does not withstand intermediate scrutiny insofar as it prohibits core expressive conduct, and is therefore unconstitutional in that respect.

I.

As a preliminary matter, but one critical to my larger concerns, I would hold—contrary to the majority's conclusion—that the district court's admission of the expert testimony of California Highway Patrol (CHP) officer Sergeant William Beck in support of Defendants' motion for summary judgment was an abuse of discretion.

"Before admitting expert testimony into evidence, the district court must perform a 'gatekeeping role' of ensuring that the testimony is both 'relevant' and 'reliable'" under

---

[1] The majority refers to the defendants, the Sheriff of San Diego County and the Commissioner of the California Highway Patrol, collectively as "the State." *See* Majority Op. 8. I use the term "Defendants" instead.

Federal Rule of Evidence 702. *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). The majority assumes that Beck's experience working for the CHP provided a reliable basis for his opinions as to Section 27001's impact on road safety. *See* Majority Op. 25–27. But "reliability becomes more, not less, important when the 'experience-based' expert opinion is . . . not subject to routine testing, error rate, or peer review type analysis, like science-based expert testimony." *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020). An examination of the record reveals that Beck utterly failed to explain how his general law enforcement experience supported the specific opinions he enunciated regarding the impact of Section 27001—especially with regard to political protest honking—on traffic safety.

Beck declared that his opinions were based on his "24 years of experience working for the California Highway Patrol." Based on that experience alone, he opined that the improper use of a vehicle horn can create danger by startling or distracting others. But when asked during his deposition for the basis of this opinion, Beck couldn't articulate a reasoned explanation for the connection between his experience and that opinion. He did not provide a single example of an accident caused by *any* type of horn honking, let alone honking in support of a political protest.

Of the three examples he was able to give in which he was personally distracted by horn honking, two of the examples were safety-related honks, permissible under Section 27001, used to notify drivers "backing out" who "don't see other people that are behind them." In reciting the third example, Beck explained that he has been briefly startled "when I'm writing a citation" or "working a traffic

collision" and "somebody blasts their horn for a reason." In none of these examples did Beck report any actual danger created by the honk. And, in any case, those examples were based on Beck's personal experience, no different from anyone else's experience with horn honking and so unrelated to any "scientific, technical, or other specialized knowledge" or experience. *Compare* Fed. R. Evid. 701(c), *with* 702(a). The examples are therefore not admissible as a basis for expert opinion.

Beck also conjectured that a horn's usefulness as a warning device would be diminished if law enforcement officers were unable to enforce Section 27001. People, he supposed, would think it "okay to use your horn whenever you want for whatever purpose and I feel that people would not recognize the horn as something that's used for safety." He analogized the enforcement of Section 27001 to speeding laws and bicycle helmet laws, opining that "more people break [the] law if we're not out enforcing it."

One problem with this speculative testimony is that nothing in Beck's specific experiences as a CHP officer provides a basis for determining the effect of non-enforcement of traffic laws. He did not suggest that he has done, or read, any studies demonstrating a correlation between the degree of enforcement of speeding or bike helmet laws and the prevalence of violations of those laws. Nor did he aver, even anecdotally, that he had observed in his experience that fewer people speed or more people wear bike helmets in areas where the relevant statutes are enforced.

Moreover, and more importantly, Beck reported that, in his twenty-four-year career, he had stopped people for a Section 27001 violation only "four or five times" and the last

time he wrote a citation was "several years ago . . . probably around 2013, 2014." Thus, his opinion as to the salutary effect of actually enforcing Section 27001's ban on non-safety-related horn honking has no grounding in his own experience, as he has exceedingly rarely enforced the statute.

Finally, Beck opined that other laws, including local noise ordinances and California Penal Code Section 415(2), are inadequate alternatives to Section 27001.**[2]** But he stated that "I have not generally enforced local ordinances," that he was not aware of any local noise ordinances, and that he was not aware of any specific situation where enforcement of a local noise ordinance was an inadequate substitute for the absolute prohibition contained in Section 27001. He also stated that he had never personally enforced, nor seen an officer enforce, Section 415(2) against horn honking, nor was he aware of any specific problems that would arise were an officer to attempt to do so.

When an expert witness "is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. Although Beck's "qualifications and experience are relevant . . . the record contains no evidence as to why that experience, by itself, equals reliability for his testimony." *Valencia-Lopez*, 971 F.3d at 898, 900. An expert "must establish that reliable principles and methods underlie the particular conclusions

---

[2] Penal Code Section 415(2) provides that "[a]ny person who maliciously and willfully disturbs another person by loud and unreasonable noise . . . shall be punished" by imprisonment or fine.

offered." *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002). Beck could point to nothing specific in his experience as a CHP officer to substantiate his general speculations about the effect of horn honking on traffic safety, or any basis for supposing that the inclusion of political protest honking in Section 27001 enhances traffic safety. As a result, that testimony does not satisfy the reliability requirement of Rule 702.

The district court thus abused its discretion when it admitted Beck's expert testimony. That error was far from harmless. As discussed later, Beck's testimony was the *only* evidence upon which the district court relied, and which the majority opinion emphasizes, to conclude that Section 27001 passes intermediate scrutiny as applied to horn honking as a medium for political protest.

## II.

Turning now to the merits of Porter's First Amendment challenge, I would hold that Section 27001 is unconstitutional as applied to political expressive conduct such as Porter's. The majority's fundamental error, in my view, in concluding otherwise is that it does not sufficiently focus on the specific type of enforcement at the core of this case—enforcement against honking in response to a political protest.

Generally, when a statute has both constitutional and unconstitutional applications, we "enjoin only the unconstitutional applications . . . while leaving other applications in force." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006). Porter was cited for honking in support of a political protest, and she asserted in her deposition that the threat of enforcement has chilled her future plans only for such political honking; she did not aver

an intent to engage in any other honking she characterizes as "expressive." So the particular "subset of the statute's applications" cognizably challenged here is the enforcement of Section 27001 against political protest honking. *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011).

The requested relief in Porter's complaint does include enjoining Defendants from enforcing Section 27001 against "protected speech or expression." The complaint and her briefs on appeal assert that "expressive" honking can include using a vehicle horn to "express support or approval of parades, protests, rallies, demonstrations, or fundraising or for other expressive purposes such as greeting a relative, friend, or acquaintance." Relying on this expansion of the requested relief beyond Porter's own past experience and desired future actions, the majority states that, because Porter seeks to enjoin enforcement against all expressive honking, "we decide only whether the statute is unconstitutional on its face or as applied to all expressive honking." Majority Op. 18 n.6.

But we are not bound by the scope of a party's requested remedy. *See, e.g.*, *Hoye*, 653 F.3d at 856–57 (crafting narrow declaratory relief despite plaintiff's broad facial challenge to ordinance); *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 842–44 (9th Cir. 2007) (affirming partial rather than blanket injunction requested by parties). Porter's actual injury, past and future, which provides her Article III standing, is narrower than the scope of the injunctive relief she requested. *See* Majority Op. 11–13. Moreover, as will appear, I would conclude that "expressive horn use" is a fairly narrow subset of horn beeping, of which political protest honking is the most obvious example.

For these reasons, I concentrate this dissent on the application of Section 27001 to political protest honking.

A.

I agree with the majority that "at least some of the honking prohibited by Section 27001 is expressive for First Amendment purposes," Majority Op. 16, and that Section 27001 is content neutral, *id.* at 18–22. It is important to clarify, however, that honking at a political protest is a *core* form of expressive conduct that merits the most stringent constitutional protection, and is, in that respect, qualitatively different from warning honks and other forms of vehicle horn use.

Expressive conduct that merits protection under the First Amendment is "characterized by two requirements: (1) an intent to convey a particularized message and (2) a great likelihood that the message would be understood by those who viewed it." *Edge v. City of Everett*, 929 F.3d 657, 668 (9th Cir. 2019) (cleaned up). Porter's political protest honking meets both criteria.

The incident that gave rise to this lawsuit is illustrative. Porter honked "in three clusters of short beeps" while driving by a political protest, and "her intent was to show support for the protest." Majority Op. 17. The crowd cheered, suggesting that her intended message was understood. *Id.* The officers' body-worn camera footage shows that many other drivers honked as they drove by the protest that day, with protesters cheering in response. More

generally, honking is a widespread, long-established form of political protest.**[3]**

Political honking is thus "imbued with elements of communication." *Spence v. State of Wash.*, 418 U.S. 405, 409 (1974). As the majority explains, such honking "carr[ies] a message that 'is intended to be communicative and that, in context would reasonably be understood by the [listener] to be communicative.'" Majority Op. 17 (quoting *Clark v. Cmty. For Creative Non-Violence*, 468 U.S. 288, 294 (1984)). "The expressive, overtly political nature of [Porter's] conduct was both intentional and overwhelmingly apparent." *Texas v. Johnson*, 491 U.S. 397, 406 (1989).

But most other honking is not equally expressive. As the majority notes, ordinarily, "a honk is just a noise." Majority Op. 17. Thus, whether any given honk is "sufficiently imbued with elements of communication" to constitute protected expression depends on "the nature of [the] activity, combined with the factual context and environment in which it was undertaken." *Id*. at 16–17 (quoting *Spence*, 418 U.S. at 409–10). "It is possible to find some kernel of expression in almost every activity a person undertakes . . . but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 570, (1991) (quoting *Dallas v. Stanglin*, 490 U.S. 19, 25 (1989)).

---

[3] *See, e.g.*, Kirk Johnson, *Honk if You Agree There Is a Difference Between Free Speech and Noise*, N.Y. Times, Nov. 18, 2011, https://www.nytimes.com/2011/11/19/us/is-honking-free-speech-or-just-noise-pollution.html; *Honk for Peace Cases*, ACLU of Minnesota, https://www.aclu-mn.org/en/cases/honk-peace-cases; Honk for Justice Chicago, https://honkforjusticechicago.com/.

Warning honks, for example, are, in my view, not expressive conduct.[4] A person's reaction to hearing a warning honk is to look up or toward the source of the noise. But "given the inflexibility of the medium," Majority Op. 17, the hearer cannot tell if the honk conveys some specific traffic direction—for example, whether it means "slow down" or "speed up." Instead, a warning honk is just a loud noise that grabs the attention of the hearer. Once engaged, the hearer can notice the traffic situation and determine an appropriate course of action. This attention-grabbing function is why the Vehicle Code requires vehicle horns to be loud, "capable of emitting sound audible under normal conditions from a distance of not less than 200 feet." Cal. Veh. Code § 27000(a). And it is also why a warning honk does not carry a "great" likelihood of conveying a "particularized message," *Johnson*, 491 U.S. at 404—it is just a noise.

Because of the attention-alerting nature of a warning honk, determining whether a honk qualifies as a warning honk does not require evaluating and differentiating honks based on their content. A law enforcement officer seeking to determine whether a beep on the horn was a warning honk, as the majority explains, "need only observe the traffic circumstances and determine if a safety risk is present." Majority Op. 20. I therefore agree that "Section 27001 draws a line based on the surrounding factual situation, not based on the content of expression." *Id.* at 17.

I would go further: In *many* contexts, a honk conveys no comprehensible expressive message. Porter asserts that

---

[4] The majority leaves this issue (slightly) open, simply noting that Porter's "assertion that honking to give a warning is a form of expression" is "questionable." Majority Op. 19.

honks to "greet friends or neighbors" or "summon children or co-workers" are expressive honks. But even in those instances, honks are used to grab the hearer's attention, not to convey any articulable message. A greeting honk, for example, emits a loud noise that causes the listener to look up; the honk itself is not a greeting message, but it causes the listener to look up, notice, and identify the honker as a friend. Similarly, a honk to summon a child does not itself convey a message; it grabs the child's attention, so she notices that her parent is waiting for her.

Honking at a political protest, on the other hand, is a use of a vehicle horn that definitely *does* constitute message-conveying expressive conduct and so merits First Amendment protection. When Susan Porter honked while passing a protest against U.S. Representative Darrell Issa, she was not just making noise to attract attention. She was conveying a distinct message—agreement with the protesters' objections to Darrell Issa's stance on gun control. And that message was understood, as the protesters cheered when she beeped. The protesters did not have to be startled into looking up to understand what Porter was honking about; in the context, they understood the message immediately.

Because political protest honking conveys a distinct message, one that implicates core First Amendment values, it is the banning of this message that should be—but in the majority opinion is not—the focus of the First Amendment analysis. The constitutionality of Section 27001 must be weighed specifically in light of the restrictions it places on political expression. *See, e.g.*, *Johnson*, 491 U.S. at 402–20 (analyzing constitutionality of a statute prohibiting flag burning based on its restriction of an individual's political

protest regarding the renomination of Ronald Reagan for president).

B.

Beginning from that premise, I cannot agree with the majority's conclusion that Defendants have sufficiently demonstrated that Section 27001's restriction on political protest honking furthers a significant government interest.[5]

The asserted government interests in traffic safety and noise control are substantial. However, the fact "[t]hat the Government's asserted interests are important in the abstract does not mean . . . that [a challenged statute] will in fact advance those interests." *Turner Broad. Sys., Inc. v. F.C.C.,* 512 U.S. 622, 664 (1994). "When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms," the government has the burden to "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* "[M]erely invoking interests in regulating traffic" or noise control "is insufficient." *Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 859 (9th Cir. 2004).

I would hold that Defendants have not met their burden to show that the asserted harms caused by political honking

---

[5] I assume for purposes of this dissent that intermediate scrutiny applies. But I am not certain that categorization is correct. As Section 27001, in my view, mostly applies to non-expressive conduct, the content neutrality rubric adopted by the majority, *see* Majority Op. 13–16, seems inapplicable. Rather, once again, the focus should be on the ban of political protest honking—a ban that viewed discretely would surely trigger strict scrutiny. *See, e.g.*, *Meyer v. Grant*, 486 U.S. 414, 420 (1988).

are real. Sergeant Beck's testimony is the *only* evidence upon which the district court relied. As I have explained, I would hold that evidence inadmissible as not meeting the standards for competent expert testimony. With that evidence out of the case, there is no basis whatever in the record for concluding that the asserted governmental interests supporting a ban on political horn honking are substantial.

Even if Beck's testimony were admissible, my conclusion would be the same. Beck hypothesized that without Section 27001, "the public in general would . . . [think it was] okay to use your horn whenever you want" and "the effectiveness of the horn would be diminished." Yet, as discussed above, in his twenty-four-year career with the CHP, Beck did not know of a single accident caused by any type of horn honking, let alone the political honking at issue here. And he did not purport to offer any opinions as to the impact of horn honking on noise control concerns.

Defendants offered no other evidence deemed admissible by the district court to demonstrate that political horn honking endangers its asserted interests. For example, no evidence was introduced about the frequency of political honking, the relationship between political honking and increased traffic danger, or its geographic scope. Where "[t]here is no record of harm or safety concerns caused by such activity," this "void in the record belies" the significance of the state interest. *Kuba*, 387 F.3d at 860.

Despite this lack of evidence, the majority asserts that the relationship between Section 27001 and a governmental interest in traffic safety makes "logical sense: For the horn to serve its intended purpose as a warning device, it must not be used indiscriminately." Majority Op. 24. This conclusion

is too glib. Common sense also indicates that people *do* honk their horns for non-safety reasons all the time, and that they are not cited for it.

This lack of enforcement is borne out by the record and undermines the purported importance of Section 27001 in furthering the asserted governmental interests. Any enforcement of Section 27001 is left to the broad discretion of peace officers. The result of that discretion? Section 27001 is almost never enforced, even though violations are legion. Defendants assert, for example, that of the nearly 4.3 million citations issued by CHP between 2016 and 2018, only 180 were for a Section 27001 violation, and that "the odds of anyone being cited by CHP for violating Section 27001 under any circumstances—much less at a protest— are *de minimis*."

The facts of this case bear out what everyone who drives in California knows: Section 27001 is pretty much a dead letter. The honking of horns for non-safety reasons is rampant and hardly ever sanctioned. As Deputy Klein was issuing the citation to Porter, his supervisor, Lieutenant Munsey, told him, "Oh illegally honking the horn? If you want to um, because everybody does it, if you feel like it and don't have any cites, warn them, if you don't, well, it's up to you." Klein only wrote one citation for a Section 27001 violation that day, even though he heard many people honking their horns.[6] Were there really a substantial state

---

[6] Jaywalking is a salient illustration that, where a generic traffic law is on the books but not enforced, it may well be because there's no real government interest underlying it. Jaywalking was, until recently, illegal in California, but also "endemic" and "rarely result[ed] in arrest." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019); *see* Cal. Stats. 2022, ch. 957

interest in curbing non-safety-related beeping of car horns—
let alone the protest or political honking protected by the
First Amendment—surely there would be some serious
attempt to sanction noncompliance.

C.

Even if we assume Defendants did provide sufficient
support for their asserted interests in traffic safety and noise
control, Section 27001's near-complete ban on honking is
unconstitutional because it is not narrowly tailored to serve
those interests. *Clark*, 468 U.S. at 293.

1.

To satisfy the narrow tailoring requirement, Defendants
must show that the statute "does not 'burden substantially
more speech than is necessary'" to further the asserted
governmental interests. *Comite de Jornaleros de Redondo
Beach v. City of Redondo Beach*, 657 F.3d 936, 948 (9th Cir.
2011) (quoting *Turner*, 512 U.S. at 665). "In particular, [a
statute's] expansive language can signal that the
[government] has burdened substantially more speech than

---

(A.B. 2147). Based in part on evidence that people of color and low-
income individuals are disproportionately cited for jaywalking
violations, a selective enforcement danger that arises where officers have
probable cause to make arrests but typically exercise their discretion not
to do so, the California legislature recently amended its jaywalking laws
to permit a peace officer to stop a jaywalker only if "a reasonably careful
person would realize there is an immediate danger of a collision with a
moving vehicle." *See, e.g.*, Cal. Stats. 2022, ch. 957 (A.B. 2147), §
11(b)(1); Cal. Veh. Code § 21955 (2023); *see* Colleen Shalby,
*Jaywalking Is Decriminalized in California Under New Law*, L.A.
Times, Oct. 1, 2022, https://www.latimes.com/california/story/2022-10-
01/jaywalking-decriminalized-in-california-under-new-law.

effectively advances its goals." *Cuviello v. City of Vallejo*, 944 F.3d 816, 829 (9th Cir. 2019).

Downplaying the broad sweep of the statute, the majority asserts that Defendants "did no more than eliminate the exact source of the evil it sought to remedy." Majority Op. 31 (quoting *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 808 (1984)). I would hold that Section 27001's ban on almost all honking burdens substantially more speech than necessary, because it prohibits political honking that does not implicate traffic safety or noise control concerns.

At a basic level, Section 27001—if enforced—could contribute to noise control and driver distraction; prohibiting drivers from honking in nearly all circumstances does reduces noise levels, and noise may be distracting. But a sweeping ban on nearly all honking prohibits political expression—"the core of speech protected by the First Amendment"—without regard to whether such expression actually jeopardizes the asserted governmental interests. *Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 745 (9th Cir. 2012).

The facts of this case show why this is so. Porter was cited for honking at a political protest on the sidewalk in front of a politician's office. The protest was a weekly, organized event; on this particular day, it had a sign-in table, and volunteers in vests helped pedestrians cross the street. Deputy Klein perceived that a "couple hundred" protesters were present. The protesters had a megaphone and a drum, and they held picket signs, chanted, and sang. A counter-protester stood across the street and played amplified music through big speakers to drown out the protesters. Porter honked her horn in support of the protest as she drove by—

as many others did—and Deputy Klein heard "people cheering . . . someone on a loud speaker, a microphone."

Whatever the governmental interests may be in noise control or curbing driver distraction, there's just no record evidence that Porter's political honking at an already noisy event endangered those interests. A political protest is *designed* to be noticed. As Deputy Klein testified, "it was loud." Political honking was hardly a significant source of noise or distraction in that environment. There is no basis for supposing that anyone was confused or distracted by the honking. Instead, Porter's honking was understood as political expression by the protesters, who cheered in response.

A statute is overinclusive when it prohibits expression, especially core political expression, "without any specifications or limitations that may tailor [the statute] to situations involving the most serious risk to public peace or traffic safety." *Cuviello*, 944 F.3d at 830. *Cuviello* held, for example, that a permitting requirement for using sound-amplifying devices was likely not narrowly tailored, noting that it applied to a public sidewalk next to a Six Flags theme park, an "already [] noisy area, where patrons flock in droves." *Id.* "Amidst all the noise, the sound of one bullhorn likely would not cause an additional disturbance to traffic safety or public peace." *Id.*

So here. Porter's honking was in response to an already noisy—and undoubtedly distracting to passersby and drivers—political protest. The point of such protests is to draw attention to the cause supported. As in *Cuviello*, Section 27001's broad ban on noisy, distracting political expression serves no governmental purpose where there is already cacophony and flurry. The statute therefore is not

narrowly tailored to the circumstances in which such purposes could be served.

The minimal enforcement of Section 27001 is further evidence that the statute sweeps too broadly. When police officers exercise their discretion not to enforce a statute, the fair inference is that they have concluded that no governmental interest would be served by doing so. And where, as here, the statute is almost never enforced, one can only conclude that it is vastly overbroad, and that a narrower, targeted ban would suffice.

2.

The majority recognizes that "most non-warning honks do not create distractions resulting in accidents," but holds that Section 27001 is narrowly tailored because "we discern no plausible means by which California could permit non-distracting honks while prohibiting distracting honks." Majority Op. 30. I disagree with the take-off point of this analysis, as well as with its conclusion.

As I've explained, much honking is just noise, *not* First Amendment-protected communication. *See supra* Part II.A. The obvious way to eliminate the statutory overbreadth as applied to First Amendment-protected honking is to except such beeping from the statute's reach. As Section 27001 has no such exception, an injunction against enforcement of the statute against political protest honking is an appropriate remedy for Porter's injury here. *See Ayotte*, 546 U.S. at 328–29.

Contrary to Defendants' submission, law enforcement officers should have no difficulty differentiating between non-expressive honks and political protest honks. Again, conduct is expressive only if an "intent to convey a

particularized message [is] present, and in the surrounding circumstances the likelihood [is] great that the message would be understood by those who view[] it." *Spence*, 418 U.S. at 410–11. Many honks do not communicate a particularized message and so, as I have explained, do not meet this standard. Honking in response to a political protest, in contrast, is generally understood by listeners—including law enforcement officers—as communicating a message.

i.

To the extent Defendants maintain that political protest honking itself must be regulated because such honking can be disruptive, there are alternate methods for doing so. To satisfy the narrow tailoring requirement, a statute "need not be the least restrictive or least intrusive means" of furthering legitimate governmental interests, *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989), but "an assessment of alternatives can still bear on the reasonableness of the tailoring," *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1025 (9th Cir. 2009) (quoting *Menotti v. City of Seattle*, 409 F.3d 1113, 1131 n.31 (9th Cir. 2005)). "Even under the intermediate scrutiny 'time, place, and manner' analysis, we cannot ignore the existence of . . . readily available alternatives." *Comite de Jornaleros*, 657 F.3d at 950.

Porter has identified various other laws that would allow Defendants to achieve the asserted governmental interests in traffic safety and noise control. Local noise ordinances are designed to regulate "[d]isturbing, excessive or offensive noise." San Diego, Cal., Code of Regulatory Ordinances ch. 4, § 36.401; *see, e.g.*, *id.* § 36.410 (sound level limitations on impulsive noise); Vista, Cal., Municipal Code § 8.32.040 (general noise limits). California Penal Code § 415(2) is

another tool, prohibiting "maliciously and willfully disturb[ing] another person by loud and unreasonable noise."

Porter also points to a local ordinance in Rio Rancho, New Mexico, as a viable alternative formulation for Section 27001. Rather than *prohibiting* all honking except in certain instances, as Section 27001 does, the Rio Rancho ordinance *permits* honking except when it is used "in such manner as to distract other motorists on the public way or in such a manner as to disturb the peace." *Martinez v. City of Rio Rancho*, 197 F. Supp. 3d 1294, 1300 (D.N.M. 2016) (quoting Rio Rancho Mun. Code § 12-6-12.18(5)). By narrowing the category of prohibited honking to actually disruptive honks, Rio Rancho's ordinance better targets honks that implicate the asserted governmental interests.

To be sure, Section 27001, which provides officers with broad discretion to cite the drivers of their choosing, may be easier and more efficient to enforce than those alternatives. But "the prime objective of the First Amendment is not efficiency." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014). "To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *Id.*

Defendants have not made that showing. Protest honking is geographically predictable because it occurs in response to events at fixed locations. Thus, the practical difficulties of discerning and enforcing the appropriate local noise ordinance in the vicinity of any protest are few. The record here indicates that the Sheriff and the City had received multiple noise complaints about the weekly protest, so both

the jurisdiction and the relevant noise ordinances were obvious. The geographic predictability of political honking can also facilitate the enforcement of the Penal Code or a statute like the Rio Rancho ordinance, as law enforcement resources purposefully can be dedicated to monitoring protest sites for willfully malicious and disruptive honks. In any event, any substantive difficulty in enforcing one of these ordinances or statutes would be an indication that the protest honking at issue was not disruptive or did not appreciably increase noise levels.

ii.

The majority also asserts that Section 27001 is narrowly tailored because it "plainly leaves open ample alternative channels for people to communicate their ideas and messages, including from their cars." Majority Op. 31. On this point, the facts underlying this case are again informative, as they demonstrate that Porter had no alternative to political honking on that day.

On October 17, 2017, Porter drove to the crowded protest, parked along the street, and participated in the protest for about half an hour. She then noticed that law enforcement officers were affixing parking citations on protesters' parked cars. Porter's car was parked close to a fire hydrant, so she decided to leave the protest to move her car and avoid a possible citation. By the time she found parking elsewhere and returned, she was unable to rejoin the protest because it was over.

Thus, the only opportunity Porter had to continue protesting was by honking her horn as she drove by. The alternative methods of communication the majority suggests were possible from the car—including "waving, giving a thumbs up, or raising a fist as they drive by", Majority Op.

31—would require the driver to take her hand off the wheel. Doing that would surely pose a greater threat to traffic safety than a honk easily understood as conveying a message of support for an already noisy, crowded protest.

"[D]ebate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Here, Defendants insist that they can continue to ban Porter's political expressive conduct, but offer no cognizable argument that the conduct actually endangered either traffic safety or noise control in a manner that could not be sanctioned if those dangers actually arose.

### III.

In sum, Section 27001 violates the First Amendment because Defendants have not shown that the statute furthers a significant government interest as applied to political protest honking, and because the statute is not narrowly tailored to exclude such honking. I would grant an injunction prohibiting the enforcement of Section 27001 against political protest honking.[7]

---

[7] I would not extend the injunction to all "expressive" honking, as the term is too vague to be enforceable, *see* Fed. R. Civ. P. 65(d), and an injunction limited to political honking would cure the injury-in-fact Porter identifies. As discussed, Porter has stated that, in the future, she wishes to engage specifically in political protest honking. Others who wish to beep their horns to convey a specific message may seek similar relief, and an injunction could be tailored to cover their communication if the communication were determined to constitute expressive conduct.

**APPENDIX**

**Alabama:** "It shall be unlawful . . . for any person to use upon a vehicle any siren or for any person at any time to use a horn otherwise than as a reasonable warning." Ala. Code § 32-5-213(a).

**Alaska:** "The driver of a motor vehicle shall, when reasonably necessary to insure safe operation, give audible warning with his horn, but may not otherwise use the horn when upon a highway or other vehicular way or area." Alaska Admin. Code tit. 13, § 04.210(a).

**Arizona:** "If reasonably necessary to ensure the safe operation of a motor vehicle, the driver shall give an audible warning with the driver's horn but shall not otherwise use the horn when on a highway." Ariz. Rev. Stat. § 28-954(B).

**Arkansas:** "When reasonably necessary to ensure safe operation, the driver of a motor vehicle shall give audible warning with his or her horn but shall not otherwise use the horn when upon a public street or highway." Ark. Code Ann. § 27-37-202(a)(2).

**California:** "The driver of a motor vehicle when reasonably necessary to insure safe operation shall give audible warning with his horn. . . . The horn shall not otherwise be used, except as a theft alarm system." Cal. Veh. Code § 27001(a)-(b).

**Colorado:** "The driver of a motor vehicle, when reasonably necessary to ensure safe operation, shall give audible warning with the horn but shall not otherwise use such horn when upon a highway." Colo. Rev. Stat. § 42-4-224(1).

**Delaware:** "The driver of a vehicle shall, when reasonably necessary to insure safe operation, give audible warning with the horn but shall not otherwise use the horn for any other purpose." Del. Code Ann. tit. 21, § 4306(b).

**Georgia:** "The driver of a motor vehicle shall, when it is reasonably necessary to ensure safe operation, give audible warning with his or her horn but shall not otherwise use such horn when upon a highway." Ga. Code Ann. § 40-8-70(a).

**Idaho:** "The driver of a motor vehicle shall when reasonably necessary to insure safe operation give audible warning with his horn, but shall not otherwise use the horn when upon a highway." Idaho Code § 49-956(1).

**Illinois:** "The driver of a motor vehicle shall when reasonably necessary to insure safe operation give audible warning with his horn but shall not otherwise use such horn when upon a highway." 625 Ill. Comp. Stat. 5 / 12-601(a).

**Indiana:** "The driver of a motor vehicle shall, when reasonably necessary to ensure safe operation, give audible warning with the horn on the motor vehicle but may not otherwise use the horn when upon a highway." Ind. Code § 9-19-5-2.

**Iowa:** "The driver of a motor vehicle shall when reasonably necessary to insure safe operation give audible warning with the horn but shall not otherwise use such horn when upon a highway." Iowa Code § 321.432.

**Kansas:** "The driver of a motor vehicle when reasonably necessary to insure safe operation shall give audible warning with his horn but shall not otherwise use such horn when upon a highway." Kan. Stat. Ann. § 8-1738(a).

**Kentucky:** "Every person operating an automobile or bicycle shall sound the horn or sound device whenever necessary as a warning of the approach of such vehicle to pedestrians or other vehicles, but shall not sound the horn or sound device unnecessarily." Ky. Rev. Stat. Ann. § 189.080.

**Louisiana:** "The driver of a motor vehicle shall, when reasonably necessary to ensure safe operation, give audible warning with his horn, but shall not otherwise use such horn when upon a highway of this state."  La. Stat. Ann. § 32:351(A)(1).

**Maine:** "A person may not unnecessarily sound a signaling device or horn."  Me. Rev. Stat. tit. 29-A, § 1903(2).

**Maryland:** "The driver of a motor vehicle shall, when reasonably necessary to insure safe operation, give audible warning with his horn, but may not otherwise use the horn when on a highway."  Md. Code Ann., Transp. § 22-401(b).

**Michigan:** "The driver of a motor vehicle shall when reasonably necessary to insure safe operation give audible warning with his horn but shall not otherwise use the horn when upon a highway."  Mich. Comp. Laws § 257.706(a).

**Minnesota:** "The driver of a motor vehicle shall, when reasonably necessary to insure safe operation, give audible warning with the horn, but shall not otherwise use the horn when upon a highway."  Minn. Stat. § 169.68(a).

**Mississippi:** "The driver of a motor vehicle shall, when reasonably necessary to insure safe operation, give audible warning with his horn but shall not otherwise use such horn upon a highway."  Miss. Code Ann. § 63-7-65(1).

**Missouri:** "Such signaling device shall be used for warning purposes only and shall not be used for making any unnecessary noise, and no other sound-producing signaling device shall be used at any time."  Mo. Rev. Stat. § 307.170(1).

**Montana:** "The driver of a motor vehicle shall when reasonably necessary to ensure safe operation give audible

warning with the horn but may not otherwise use the horn when upon a highway." Mont. Code Ann. § 61-9-401(1).

**Nebraska:** "[I]t shall be unlawful . . . for any person at any time to use a horn, otherwise than as a reasonable warning." Neb. Rev. Stat. § 60-6,285.

**Nevada:** "A person driving a motor vehicle shall, when reasonably necessary to ensure safe operation, give audible warning with the horn, but shall not otherwise use the horn when upon a highway." Nev. Rev. Stat. § 484D.400(2).

**New Jersey:** "The driver of a motor vehicle shall, when reasonably necessary to insure safe operation, give audible warning with his horn but shall not otherwise use such horn when upon a highway." N.J. Stat. Ann. § 39:3-69.

**New Mexico:** "The driver of a motor vehicle shall when reasonably necessary to ensure safe operation give audible warning with his horn but shall not otherwise use such horn when upon a highway." N.M. Stat. Ann. § 66-3-843(A).

**New York:** "[The] horn or device shall produce a sound sufficiently loud to serve as a danger warning but shall not be used other than as a reasonable warning nor be unnecessarily loud or harsh." N.Y. Veh. & Traf. Law § 375(1)(a).

**North Carolina:** "[I]t shall be unlawful . . . for any person at any time to use a horn otherwise than as a reasonable warning." N.C. Gen. Stat. § 20-125(a).

**North Dakota:** "Whenever reasonably necessary for safe operation, the driver of a motor vehicle upon a highway shall give audible warning with the vehicle's horn, but may not otherwise use the vehicle's horn while upon a highway." N.D. Cent. Code § 39-21-36(1).

**Oregon:** "A person commits the offense of violation of use limits on sound equipment if the person . . . [u]ses a horn otherwise than as a reasonable warning." Or. Rev. Stat. § 815.225(1)(b).

**Rhode Island:** "The driver of a motor vehicle shall when reasonably necessary to insure safe operation give audible warning with his or her horn but shall not otherwise use the horn when upon a highway." R.I. Gen. Laws § 31-23-8.

**South Carolina:** "The driver of a motor vehicle shall, when reasonably necessary to insure safe operation, give audible warning with his horn but shall not otherwise use such horn when upon a highway." S.C. Code Ann. § 56-5-4960.

**Tennessee:** "[I]t is unlawful . . . for any person at any time to use a horn otherwise than as a reasonable warning." Tenn. Code Ann. § 55-9-201(a).

**Texas:** "A motor vehicle operator shall use a horn to provide audible warning only when necessary to insure safe operation." Tex. Transp. Code Ann. § 547.501(c).

**Utah:** "The operator of a motor vehicle . . . when reasonably necessary to insure safe operation, shall give audible warning with the horn; and . . . except as provided [herein], may not use the horn on a highway." Utah Code Ann. § 41-6a-1625(1)(c)(i)-(ii).

**Vermont:** "The operator of a motor vehicle, whenever reasonably necessary to ensure safe operation, shall give an audible warning with the horn of his or her vehicle but shall not otherwise use the horn when upon a highway." Vt. Stat. Ann. tit. 23, § 1131.

**Virginia:** "It shall . . . be unlawful for any person at any time to use a horn otherwise than as a reasonable warning." Va. Code Ann. § 46.2-1060.

**Washington:** "The driver of a motor vehicle shall when reasonably necessary to insure safe operation give audible warning with his or her horn but shall not otherwise use such horn when upon a highway." Wash. Rev. Code § 46.37.380(1).

**West Virginia:** "The driver of a motor vehicle shall when reasonably necessary to insure safe operation give audible warning with his horn but shall not otherwise use such horn when upon a highway." W. Va. Code § 17C-15-33(a).

**Wisconsin:** "[N]o person shall at any time use a horn otherwise than as a reasonable warning." Wis. Stat. § 347.38(1).

**Wyoming:** "The driver of a motor vehicle shall when reasonably necessary to insure safe operation give audible warning with his horn but shall not otherwise use the horn when upon a highway." Wyo. Stat. Ann § 31-5-952(a).

**Uniform Vehicle Code:** "The driver of a motor vehicle shall when reasonably necessary to insure safe operation give audible warning with the horn but shall not otherwise use it." Unif. Veh. Code § 12-401(a) (Nat'l Comm. on Unif. Traffic Laws & Ordinances 2000).